[No. S116870. Aug. 8, 2005.]

THE PEOPLE ex rel. DEPARTMENT OF CONSERVATION et al.,
Plaintiffs and Appellants, v.
EL DORADO COUNTY et al., Defendants and Respondents;
LORING BRUNIUS, Real Party in Interest and Respondent;
CALIFORNIA MINING ASSOCIATION et al., Interveners and
Respondents.

COUNSEL

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Richard M. Frank and Tom Greene, Chief Assistant Attorneys General, Mary E. Hackenbracht, Assistant Attorney General, and Richard M. Thalhammer, Deputy Attorney General, for Plaintiffs and Appellants.

Law Offices of Robert Cooper and Robert Cooper for Paramount NE as Amicus Curiae on behalf of Plaintiffs and Appellants.

Louis B. Green, County Counsel, Edward L. Knapp, Chief Assistant County Counsel; The Diepenbrock Law Firm, Mark D. Harrison, Gene K. Cheever, Michael V. Brady, Jeffrey K. Dorso, Andrea A. Matarazzo and Michael E. Vinding for Defendants and Respondents.

Bingham McCutchen, Peter N. Morrisette; Ebbin Moser + Skaggs and David E. Moser for Interveners and Respondents.

Becker & Runkle and David C. Becker for Real Party in Interest and Respondent.

Robin L. Rivett and Emma T. Suárez Pawlicki for Pacific Legal Foundation as Amicus Curiae on behalf of Defendants and Respondents, Interveners and Respondents and Real Party in Interest and Respondent.

Jennifer B. Henning; McDonough, Holland & Allen and John R. Briggs for California State Association of Counties and Regional Council for Rural Counties as Amici Curiae on behalf of Defendants and Respondents, Interveners and Respondents and Real Party in Interest and Respondent.

Hatch & Parent and Lisabeth D. Rothman for California Building Industry Association, Building Industry Legal Defense Foundation and Home Builders Association of Northern California as Amici Curiae.

OPINION

**WERDEGAR, J.**—Does the Director of the Department of Conservation (Director) have standing to file a petition for a writ of mandate challenging reclamation plans and financial assurances for surface mining operations approved by defendant El Dorado County (County) under the Surface Mining

and Reclamation Act of 1975 (SMARA) (Pub. Resources Code, § 2710 et seq.)?[1] We conclude he has.

*Background*[2]

SMARA, enacted in 1975 (Stats. 1975, ch. 1131, § 11, p. 2793), requires that California surface miners provide reclamation plans for their mining operations and financial assurances to implement those plans. (§ 2770, subd. (a).) A reclamation plan under SMARA is a written plan specifying how mined land will be treated so as to minimize the environmental impacts of mining and render a mined site usable in the future for alternative purposes. (See § 2733.) Financial assurances are a mine operator's pledges of funds sufficient to perform reclamation in accordance with an approved reclamation plan. (§ 2773.1, subd. (a)(1).) SMARA prohibits the continuation past stated dates of any surface mining operation not covered by a reclamation plan and financial assurances that have been approved by the "lead agency" responsible for that operation. (§ 2770, subd. (d).)

Respondent and real party in interest Loring Brunius operates two surface mines, Weber Creek Quarry and Diamond Quarry, in respondent County. County, as designated lead agency, was primarily responsible for ensuring compliance with SMARA in its jurisdiction. (§ 2774.1, subd. (f).) The Director is vested with control of the Department of Conservation (Department) (see § 601) and also is assigned various responsibilities under SMARA (see, e.g., §§ 2774, 2774.1, 2796, 2796.5), as will be explained.

Both the Director and the State Mining and Geology Board (Board) (see § 660 et seq.) in the mid-1990's sought to enforce SMARA against Brunius, who at the time was operating both of his quarries without approved reclamation plans or financial assurances. In June 1995, the Director obtained a stipulated judgment requiring Brunius to pay $70,000 in administrative penalties subject to reduction if Brunius complied with SMARA by certain dates. When Brunius failed timely to comply, the Director ordered him to cease all mining activity at Weber Creek Quarry and Diamond Quarry. Brunius, however, having subsequently submitted reclamation plans and financial assurances, obtained a preliminary injunction against operation of the Director's order, in light of Brunius's pending applications for County's approval of his plans and assurances. The Board, for its part, finding that

---

[1] Unlabeled statutory references are to the Public Resources Code.

[2] The requests for judicial notice filed on January 30, 2004 (by County and the Board of Supervisors of County), April 8, 2004 (by California State Association of Counties and Regional Counsel for Rural Counties), October 15, 2004 (by County and the Board of Supervisors of County), and November 29, 2004 (by California Building Industry Association et al.) are granted.

County had, in violation of SMARA, allowed Weber Creek Quarry to operate since 1982 without an approved reclamation plan and since 1994 without approved financial assurances, commenced SMARA's prescribed procedures for assuming lead agency powers in the County. (§ 2774.4.)

As part of the review process of Brunius's reclamation plans and financial assurances, the Director submitted extensive comments as to their inadequacy. In July 1997, County's Planning Commission nevertheless approved the plans and assurances, as well as a mitigated negative declaration under the California Environmental Quality Act (CEQA) (§ 21000 et seq.; see also Cal. Code Regs., tit. 14, § 15000 et seq., especially id., § 15070), for both Weber Creek Quarry and Diamond Quarry. The Director appealed these approvals to County's Board of Supervisors, which adopted the mitigated negative declarations and approved the plans and assurances.

Our question arises out of the Director's filing, in September 1997, two petitions for writs of administrative mandate (Code Civ. Proc., § 1094.5) against County and Brunius, seeking to vacate County's approvals as in violation of both SMARA and CEQA. The Director alleged that Brunius's reclamation plans did not meet SMARA's specifications and that his financial assurances were inadequate. The Director also alleged that County had violated CEQA in approving the mitigated negative declarations for Brunius's operations.

The Director's two petitions subsequently were consolidated. In March 1998, the Director filed amended petitions, adding allegations that County had (1) erroneously concluded Brunius possessed a vested right to operate Weber Creek Quarry without a permit, and (2) allowed Brunius unlawfully to expand operations at Diamond Quarry.

The California Mining Association, the Construction Materials Association of California, and the Southern California Rock Products Association (Interveners), all trade associations, were granted leave to intervene. County, Brunius, and Interveners each demurred on the ground the Director lacked standing. The trial court overruled the demurrers, and the Court of Appeal denied Interveners' and County's petitions for writs of mandate or other relief from the trial court's ruling.

In answering the Director's petitions, County and Brunius alleged the Director's lack of standing as an affirmative defense; the Interveners' complaint also alleged the Director's lack of standing. The trial court granted County summary adjudication on the Director's claim in the Weber Creek Quarry writ that County erred in finding the Weber Creek Quarry was a "vested use," exempt from various SMARA and permitting requirements. The

trial court then granted County and Brunius's motion to dismiss the CEQA claims for the Director's failure timely to request a hearing (§ 21167.4). Finally, the trial court dismissed the Director's remaining SMARA claims on the ground the Director lacked standing to maintain them. The trial court awarded attorney fees to County, Brunius, and the Interveners under Code of Civil Procedure section 1021.5.

A divided Court of Appeal affirmed on standing grounds the dismissal of the Director's SMARA and CEQA claims, but reversed the trial court's attorney fees award. The Department, Brunius, and County each filed a petition for review. We granted all three petitions.[3]

## Discussion

We are concerned here not with the merits of the underlying dispute, but only with the procedural question whether the Director has standing to petition for a writ of mandate. Answering this question requires us to examine the Director's role, generally, as the executive officer of a state department and, more specifically, within SMARA.

### A. *Statutory Background*

The majority in the Court of Appeal below accurately detailed the relevant statutory background:

■ "Within the Resources Agency is the Department of Conservation (the Department). The head of the Department is an executive officer appointed by the Governor, known as the Director. (§ 601.) The Department's work is divided into at least four divisions: mines and geology; oil, gas, and geothermal resources; land conservation; and recycling. (§ 607.)

"Also in the Department is the nine-member State Mining and Geology Board. (§ 660.) . . . The Board represents the state's interests in the development, utilization, and conservation of mineral resources in California and the reclamation of mined lands, and in federal matters pertaining to mining. The Board also determines, establishes, and maintains an adequate surface mining and reclamation policy. (§ 672.) Although the Director is the head of the Department, he does not control the Board; the Director has no power to amend or repeal any order, ruling, or directive of the Board. (§ 671.) [¶] . . . [¶]

---

[3] We initially limited briefing to the question whether the Director has standing; subsequently, we requested that the parties also discuss the standard of review a reviewing court should apply in determining whether an action enforces an important right affecting the public interest so as to justify an award of attorney fees. As will appear, in light of our resolution of the standing issue, we have no occasion to reach the attorney fees issue.

■ "The Legislature [in adopting SMARA] intended to create and maintain an effective surface mining and reclamation policy to prevent or minimize adverse environmental effects, reclaim mined lands to a usable condition which is ad[a]ptable to alternative uses, and encourage the production and conservation of minerals while giving consideration to values relating to recreation, watershed, wildlife, range and forage, and aesthetic enjoyment. (§ 2712.)

"At the heart of SMARA is the requirement that every surface mining operation have a permit, a reclamation plan, and financial assurances. (§ 2770, subd. (a).) . . . The financial assurances must remain in effect for the duration of the mining operation and until reclamation is complete and shall be made payable to the lead agency and the Department. (§ 2773.1, subd. (a)(2).) The financial assurances may be forfeited if the lead agency or the Board determines the operator is financially incapable of performing reclamation in accordance with the approved reclamation plan, or has abandoned its surface mining operation without commencing reclamation. (§ 2773.1, subd. (b).)

■ "In keeping with the recognition of the diverse conditions throughout the state, SMARA provides for 'home rule,' with the local lead agency having primary responsibility. A lead agency is usually the city or county. (§ 2728.) The mining operator submits the reclamation plan and financial assurances to the lead agency for review. (§ 2770, subd. (d); § 2772.) The Board, through regulations, specifies minimum statewide reclamation standards. (§ 2773.) A lead agency, however, may permit a mining operation to deviate from these standards, if necessary based on the approved end use. (Cal. Code Regs., tit. 14, § 3700.)

■ "To implement its review of proposed reclamation plans and financial assurances, every lead agency is to adopt ordinances in accordance with state policy. (§ 2774, subd. (a).) The Board shall review these ordinances and certify that they are in compliance with state policy. (§ 2774.3.) If the Board finds deficiencies in the lead agency's ordinance, the Board shall communicate the deficiencies to the lead agency. (§ 2774.5, subd. (a).) After an opportunity to revise the ordinance to comply with state policy, if the Board finds the ordinance is still deficient, the Board shall assume full responsibility for review of reclamation plans. (§ 2774.5, subd. (b).) If the lead agency does not have a certified ordinance, reclamation plans shall be submitted to and approved by the Board. (§ 2774.5, subd. (c).) The Board may amend any reclamation plan that was approved by a lead agency at the time the lead agency's ordinance did not comply with state policy. (§ 2774.5, subd. (c).)

■ "Prior to approving reclamation plans and financial assurances, the lead agency submits the proposals and all supporting documentation, including information from any document prepared, adopted or certified pursuant to

CEQA, to the Director for review. (§ 2774, subd. (c).) The Director then may prepare written comments, if he chooses, within 30 days for reclamation plans and 45 days for financial assurances. (§ 2774, subd. (d)(1).) The lead agency shall prepare written responses to the Director's comments, describing disposition of the major issues raised. In particular, the lead agency shall explain in detail why any specific comments and suggestions were not accepted. (§ 2774, subd. (d)(2).) Thus, although the lead agency must evaluate and respond to the Director's comments, it need not always accept them.

"If a lead agency fails to approve a reclamation plan or financial assurances, an appeal may be taken to the Board. (§ 2770, subd. (e).) As originally enacted, SMARA did not contain enforcement provisions. (Stats. 1975, ch. 1131, § 11, pp. 2793–2803.) As the author explained, SMARA did not contain enforcement provisions 'because the bill provides for a local regulatory program. Enforcement provisions would be embodied in local ordinances.'

■ "In 1990, in response to concerns about deficiencies of lead agencies in carrying out their responsibilities under SMARA, the Legislature substantially amended SMARA. The amendments provided for various types of enforcement, against both mine operators and lead agencies. Enforcement against mine operators includes notices of violations and fines. (§ 2774.1, subds. (a)–(c).) The lead agency has primary responsibility for enforcing SMARA against mine operators. (§ 2774.1, subd. (f)(1).) Where the Board is not acting as the lead agency, the Director may initiate enforcement actions where (1) the Director has notified the lead agency of the violation and the lead agency fails to take action within 15 days, or (2) the Director determines the violation amounts to imminent and substantial endangerment to the public health or safety, or to the environment. (§ 2774.1, subd. (f)(1).) Similarly, the Director may take actions to seek forfeiture of financial assurances where the lead agency has failed to act or has been unsuccessful. (§ 2773.1, subd. (d).)

■ "Where the lead agency fails to fulfill its duties under SMARA, the Board may take over the powers of a lead agency, except for permitting authority. The Board may step in if it finds that a lead agency has: (1) approved reclamation plans and financial assurances that are not consistent with SMARA; (2) failed to inspect mines as required by SMARA; (3) failed to seek forfeiture of financial assurances to carry out reclamation; (4) failed to take appropriate enforcement actions; (5) intentionally misrepresented the results of inspections; or (6) failed to submit the required information to the Department. (§ 2774, subd. (a).) The Board may take over as lead agency where the lead agency fails to submit a copy of the mining permit for every surface mining operation within its jurisdiction by July 1, 1991, or fails to

submit amendments to the permit or reclamation plans for such mines by July 1 of each subsequent year. (§ 2774, subd. (e).)

■ "SMARA contains three specific provisions for petitioning for a writ of mandate. Any person may petition for a writ of mandate to compel the Board, the state geologist, [fn. omitted] or the Director to carry out any duty imposed on them by SMARA. (§ 2716.) An operator may petition for a writ of mandate to review any administrative penalties imposed. (§ 2774.2, subd. (e).) A lead agency, an operator, or an interested party may obtain writ review of the Board's action in taking over as lead agency. (§ 2774.4, subd. (f).)"

The parties highlight three considerations bearing on the question whether the Director has standing: (1) that a writ of mandate "must be issued upon the verified petition of the party beneficially interested" (Code Civ. Proc., § 1086);[4] (2) that the Director is vested with significant, but limited, powers and responsibilities under SMARA; and (3) that "[t]he head of each [state] department may make investigations and prosecute actions concerning . . . [¶] matters relating to the business activities and subjects under the jurisdiction of the department" (Gov. Code, § 11180, subd. (a)). We briefly explain each.

*Beneficial interest requirement*

■ As noted, standing to seek a writ of mandate ordinarily requires that a party be "beneficially interested" (Code Civ. Proc., § 1086), i.e., have "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." (*Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].) This standard, we have stated, "is equivalent to the federal 'injury in fact' test, which requires a party to prove by a preponderance of the evidence that it has suffered 'an invasion of a legally protected interest that is [both] "(a) concrete and particularized, and (b) actual or imminent . . . ." ' " (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 362 [87 Cal.Rptr.2d 654, 981 P.2d 499].)

*Director's role under SMARA*

The majority in the Court of Appeal below based its decision primarily on "deference to the legislative scheme" and what it discerned therein to be "the Legislature's delicate balancing between home rule, which permits local

---

[4] In its entirety, Code of Civil Procedure section 1086 provides: "The writ must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law. It must be issued upon the verified petition of the party beneficially interested."

elected officials to make land use decisions, and effective and consistent statewide enforcement of SMARA." The majority saw as especially significant "the limited advisory role of the Director" as compared to the Board's ability to take over the powers of a lead agency. It reasoned that "the Director's limited role under SMARA, especially when compared to the Board's role in overseeing lead agencies, establishes that SMARA does not give the Director standing to petition for judicial review of a lead agency's actions in approving reclamation plans and financial assurances that do not comply with SMARA." We examine the Director's role under SMARA in detail, *post.*

*Government Code section 11180*

In concluding the Director had standing to pursue this mandate action, the dissenting justice below relied primarily on Government Code section 11180. The statute provides that the head of each state department "may make investigations and prosecute actions concerning: [¶] (a) All matters relating to the business activities and subjects under the jurisdiction of the department."[5] In the dissenting justice's view, the statute confers standing on a department head if the department head is bringing an action "relating to" the business of the department.

While we have construed Government Code section 11180's grant of investigatory powers liberally (see *Shively v. Stewart* (1966) 65 Cal.2d 475, 479–480 [55 Cal.Rptr. 217, 421 P.2d 65]), we have not addressed whether the statute's grant of prosecutorial powers warrants similar construction. And while the two California courts that have considered Government Code section 11180's implications for standing have concluded that the department head involved had standing to pursue the action at issue, neither court relied exclusively on Government Code section 11180 in reaching that conclusion. (See *People ex rel. Dept. of Conservation v. Triplett* (1996) 48 Cal.App.4th 233, 252–256 [55 Cal.Rptr.2d 610] (*Triplett*) [Department's standing rested in part on interest in Williamson Act cancellation fees]; *Tieberg v. Superior Court* (1966) 243 Cal.App.2d 277, 282–284 [52 Cal.Rptr. 33] (*Tieberg*) [Director of Department of Employment's standing to challenge Unemployment Insurance Appeals Board decision rested in part on interest in proper administration of unemployment insurance fund].) As will appear, we likewise eschew exclusive reliance on Government Code section 11180 in concluding the Director had standing to bring the actions at issue here.

---

[5] In its entirety, Government Code section 11180 provides: "The head of each department may make investigations and prosecute actions concerning: [¶] (a) All matters relating to the business activities and subjects under the jurisdiction of the department. [¶] (b) Violations of any law or rule or order of the department. [¶] (c) Such other matters as may be provided by law."

## B. *Standing*

As we shall explain, neither standing analysis proffered in the Court of Appeal below is entirely correct. The majority misread SMARA as impliedly depriving the Director of standing to seek judicial review of inadequate reclamation plans and financial assurances and too narrowly construed the concept of "beneficial interest" with respect to the Director's responsibilities. The dissenting justice, in turn, while reaching the right result, mistakenly identified Government Code section 11180 as an independent source of the Director's standing.

As the majority below discerned, Government Code section 11180 only authorizes the Director to sue; it does not of itself confer standing. " 'There is a difference between the *capacity* to sue, which is the right to come into court, and the *standing* to sue, which is the right to relief in court.' " (*Color-Vue, Inc. v. Abrams* (1996) 44 Cal.App.4th 1599, 1604 [52 Cal.Rptr.2d 443].) The statutory authorization granted department heads to sue, no matter how broadly construed, cannot alone confer on the Director standing to pursue a writ of mandate here, because such authorization does not necessarily create in him a "beneficial interest" (Code Civ. Proc., § 1086) in the writ's issuance. Notwithstanding Government Code section 11180, nothing logically precludes the Legislature from crafting a departmental director's powers and duties such that he or she lacks a beneficial interest sufficient to confer standing to sue respecting some particular "business activities and subjects under the jurisdiction of the department" (Gov. Code, § 11180, subd. (a)).

No party or amicus curiae identifies an instance of the Legislature's having so limited a department head's authority, however, nor are we aware of any. We conclude that, in any event, the Legislature has not crafted SMARA to deprive the Director of standing to seek mandate as a remedy when a local lead agency approves allegedly inadequate reclamation plans or financial assurances. Rather, correctly understood, the Director's standing to prosecute this petition for a writ of mandate derives from his "beneficial interest" (Code Civ. Proc., § 1086)—under SMARA and, generally, as a state officer charged with serving the public interest—in the adequacy of approved reclamation plans and financial assurances.

First, the Director's powers and responsibilities under SMARA raise in him a beneficial interest in lead agencies' approving adequate plans and assurances. As noted, the Director is entitled to review and comment on every reclamation plan submitted to a lead agency for approval. (§ 2774, subds. (c), (d); see also Cal. Code Regs., tit. 14, § 3805.) It is on this basis, presumably,

that the majority below characterized the Director's responsibilities as "primarily advisory." But the Director's review and comment power is not *merely* advisory; rather, its exercise triggers significant statutory obligations on the part of the lead agency.

 Initially, the lead agency must submit to the Director for review the mining operator's reclamation plan or plan amendments and financial assurances, together with any related documents prepared, adopted, or certified pursuant to CEQA. (§ 2774, subd. (c).) In so doing, the lead agency is required to certify to the Director that the reclamation plan is "in compliance with the applicable requirements . . . of the California Code of Regulations" implementing SMARA.[6] (§ 2774, subd. (c).) The lead agency also is required to evaluate, "within a reasonable amount of time" (*id.*, subd. (d)(1)), the Director's written comments relating to the submitted plan or assurances and must prepare a written response describing its disposition of the major issues raised (*id.*, subd. (d)(2)). In this response, the lead agency must "address, in detail, why specific comments and suggestions were not accepted" (*ibid.*). While the Director's responsibilities in this part of the SMARA process are advisory in form (in that the lead agency is not required to accept his suggestions), the general interest his review serves, patently, is SMARA compliance.

We note that, even were the Director's responsibilities limited to an advisory role, that would not necessarily deprive him of a beneficial interest in the approval by local agencies of adequate reclamation plans and financial assurances. As one California court has recognized in the related context of agricultural land conservation, the Legislature's having invested the Department with power to "advise any interested person or entity" about a conservation statute's purposes and implementation "points to the conclusion that the State has standing" to enforce the statute's substantive provisions, even if a local agency has the primary responsibility for implementing the statute. (*Triplett, supra,* 48 Cal.App.4th at pp. 253–254; see Gov. Code, § 51206.)[7]

 In any event, the Director's powers and responsibilities under SMARA are not limited to advice and comment. Once a reclamation plan has

---

[6] The statute's specific reference is to title 14, section 3500, of the California Code of Regulations, which provides in its entirety: "It is the purpose of this subchapter to establish state policy for the reclamation of mined lands and the conduct of surface mining operations in accord with the general provisions set forth in [SMARA]."

[7] Government Code section 51206 provides in its entirety: "The Department of Conservation may meet with and assist local, regional, state, and federal agencies, organizations, landowners, or any other person or entity in the interpretation of this chapter [i.e., the Williamson Act, concerning agricultural land conservation]. The department may research, publish, and disseminate information regarding the policies, purposes, procedures, administration, and implementation of this chapter. This section shall be liberally construed to permit the department to advise any interested person or entity regarding this chapter."

been approved, the Director has express authority to ensure that state law and the reclamation plan are implemented. (See generally § 2774.1.) The Director has power to inspect any mining operation and, if he determines it is not in compliance with SMARA, he is empowered to order the operator to comply (§ 2774.1, subd. (a)). If after a hearing before the Board the operator fails to comply, the Director may impose administrative penalties of up to $5,000 per day (*id.*, subds. (b), (c)). And if the Director determines the violation "presents an imminent and substantial endangerment to the public health or the environment," he may request the Attorney General on his behalf to seek a court order enjoining the operation. (*Id.*, subd. (d).) Finally, upon the Director's complaint, the Attorney General may bring an action to recover administrative penalties against a person violating SMARA or any regulation adopted pursuant thereto. (*Id.*, subd. (e).)[8]

▮▮▮ Plainly, these broad enforcement powers and responsibilities, directed as they are towards overall SMARA compliance and the fulfillment of state reclamation policy generally, confer on the Director a "special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large" (*Carsten v. Psychology Examining Com., supra,* 27 Cal.3d at p. 796).

For instance, if a mine operator manages, through whatever device, to obtain local lead agency approval of reclamation plans that do not comply with SMARA or its attendant regulations, or that lack safeguards sufficient to facilitate effective administrative oversight and implementation, the Director may be hampered or frustrated in subsequent efforts to enjoin or penalize mining that, on inspection, he determines compromises or threatens to compromise SMARA's public health and environmental goals. Under such circumstances, of course, simply enforcing the mine operator's statutory obligation to perform reclamation in accordance with his approved reclamation plan (§ 2773.1, subd. (b)) would by hypothesis be inadequate. Accordingly, the Director has an interest in adequate review of the original approval.

Similarly, the Director may be hampered or frustrated in the execution of his statutory powers and responsibilities if he is not permitted to seek judicial review when a lead agency approves allegedly inadequate financial assurances. A fundamental purpose of SMARA is that surface mine operators, rather than the taxpaying public, bear the expense of reclaiming lands disturbed by surface mining. To that end, lead agencies must require that a

---

[8] The local lead agency has primary responsibility for enforcing SMARA. The Director's power to initiate the described enforcement actions exists when the Board is the lead agency or, when it is not, if a SMARA violation comes to his attention and the local lead agency defaults, or the Director discerns an imminent public health or environmental threat. (§ 2774.1, subd. (f).)

mine operator's financial assurances be sufficient to perform reclamation. (§ 2770, subd. (d).) The mine operator is responsible for posting adequate assurances (§ 2773.1, subd. (a)) and for payment of any costs of reclamation in accordance with the approved plan that are in excess of the assurances (*id.,* subd. (b)(4)).

The Director's statutory powers and responsibilities relating to financial assurances submitted under SMARA reveal his substantial interest in their adequacy. Pursuant to SMARA, such assurances are to be made payable to the Department, as well as to the lead agency. (§ 2773.1, subd. (a)(4).) Under specified circumstances, the Director may seek forfeiture of financial assurances and undertake reclamation of mines. (*Id.,* subd. (d).) Specifically, if the lead agency or the Board, following a public hearing, determines an operator is financially incapable of performing reclamation in accordance with its approved plan, or has abandoned its mining operation without commencing reclamation, the Director may notify the operator that he intends to take appropriate action to forfeit the financial assurances and, after allowing the operator 60 days to commence reclamation, may "[p]roceed to take appropriate action to require forfeiture of the financial assurances if the operator does not substantially comply" (*id.,* subd. (b)(3)), using the proceeds from the forfeited financial assurances to "conduct and complete reclamation in accordance with the approved reclamation plan" (*id.,* subd. (b)(4)).[9]

Obviously, if in a case implicating the Director's statutory power to seek forfeiture of financial assurances and conduct reclamation, those assurances prove inadequate to accomplish the task, the Director cannot effectively discharge his responsibility. In such circumstances, instead of the operator paying the full cost of reclamation, the taxpaying public likely will bear part or all of the burden. Accordingly, whenever a local lead agency approves allegedly inadequate financial assurances, the Director has an interest in obtaining a writ of mandate to address the deficiencies.

---

[9] The Director's role here is a "backup" one: "The lead agency shall have primary responsibility to seek forfeiture of financial assurances and to reclaim mine sites" in such circumstances. (§ 2773.1, subd. (d).) The Director may act "if both of the following occurs: [¶] (1) The financial incapability of the operator or the abandonment of the mining operation has come to the attention of the [D]irector. [¶] (2) The lead agency has been notified in writing by the [D]irector of the financial incapability of the operator or the abandonment of the mining operation for at least 15 days, and has not taken appropriate measures to seek forfeiture of the financial assurances and reclaim the mine site; and one of the following has occurred: [¶] (A) The lead agency has been notified in writing by the [D]irector that failure to take appropriate measures to seek forfeiture of the financial assurances or to reclaim the mine site shall result in actions being taken against the lead agency under Section 2774.4. [¶] (B) The [D]irector determines that there is a violation that amounts to an imminent and substantial endangerment to the public health, safety, or to the environment. [¶] (C) The lead agency notifies the [D]irector in writing that its good faith attempts to seek forfeiture of the financial assurances have not been successful." (*Ibid.*)

■ Thus, the Director's statutorily conferred powers and responsibilities—those expressly granted him under SMARA, as well as those inhering in his capacity as the executive officer of the state department charged with SMARA's implementation—create in him a substantial interest in reclamation plans and financial assurances being both legally consistent with SMARA and practically adequate to accomplish SMARA's goals and state reclamation policy promulgated thereunder.[10] Therefore, when a local lead agency approves allegedly illegal or inadequate plans or assurances, the Director is "beneficially interested" (Code Civ. Proc., § 1086) in the issuance of a writ of mandate to address the deficiencies.

■ Second, while it is true, as the majority below observed, that the lead agency has primary responsibility for enforcing SMARA while the Director's role is a backup one (see fns. 8 and 9, *ante*), that fact is not determinative. Primary responsibility is not exclusive responsibility. Generally, "where the Legislature wants only one agency to have jurisdiction over a matter, it says so unequivocally" (*Triplett, supra*, 48 Cal.App.4th at p. 255 [discussing Pub. Util. Code, § 1759]). SMARA contains no such statement. On the contrary, the Legislature expressly has provided that the remedies SMARA accords the Director "are in addition to, and do not supersede or limit, any and all other remedies, civil or criminal" (Pub. Resources Code, § 2774.1, subd. (g)). The writ of administrative mandate, a civil remedy, is thus preserved for the Director's use when he is beneficially interested and "must be issued in all [such] cases" where he lacks "a plain, speedy, and adequate remedy, in the ordinary course of law" (Code Civ. Proc., § 1086).

■ SMARA contains several specific mandate-related provisions, but none affords a remedy when an operator obtains lead agency approval of allegedly inadequate reclamation plans or financial assurances.[11] This omission, however, does not signify that lead agencies are immune from judicial review, as " '[i]t has never been held that all laws must be contained, or references thereto made, in one statute. It is sufficient that a remedy exists whether it is expressed in the statute expressing the power or in another statute.' " (*Tieberg, supra*, 243 Cal.App.2d at p. 282, citing, inter alia, *Bodinson*

---

[10] Contrary to the Court of Appeal majority's implication, Code of Civil Procedure section 1086 does not require mandate plaintiffs to demonstrate a pecuniary interest in the writ's issuance. Whether or not SMARA's goals of actually reclaiming mined land so as to minimize adverse environmental effects (Pub. Resources Code, § 2712, subd. (a)), encouraging production and conservation of mineral resources (*id.*, subd. (b)), and protecting public health and safety (*id.*, subd. (c)) generate interests that properly may be characterized as pecuniary, they certainly offer interests that are beneficial.

[11] Any person may petition for a writ of mandate to compel the Board or the Director to carry out a duty imposed on them by SMARA. (§ 2716.) An operator may petition for a writ of mandate to review the imposition of administrative penalties. (§ 2774.2, subd. (e).) A lead agency, an operator, or an interested party may obtain writ review of the Board's action in taking over lead agency responsibilities. (§ 2774.4, subd. (f).)

*Mfg. Co. v. California E. Com.* (1941) 17 Cal.2d 321, 324, 325 [109 P.2d 935].) Here, the Director's mandate remedy is expressed in the Code of Civil Procedure and in the Government Code. (Code Civ. Proc., §§ 1086 [circumstances under which writ must issue], 1094.5 [administrative mandate]; Gov. Code, § 11180 [capacity to sue]; see also *Brown v. Superior Court* (1971) 5 Cal.3d 509, 514 [96 Cal.Rptr. 584, 487 P.2d 1224] [official with responsibility to implement disclosure laws has standing to seek a writ of mandate to enforce them].)

Our acknowledging the Director's beneficial interest in obtaining a writ of mandate neither diminishes the Board's authority as conferred by SMARA nor upsets any implicit legislative balance in the statute.[12] While the Director has no power to amend or repeal any order of the Board (§ 671), here the Director seeks no such thing. In fact, as the Court of Appeal observed, the record contains no evidence the Board disapproves of the instant lawsuits. Nor, contrary to the majority's suggestion below, does the Director seek authority to commence a mandate proceeding against a lead agency *in place of* the Board's authority to take over a lead agency's powers under section 2774.4. Indeed, after the Director filed the instant petitions, the Board assumed lead agency functions from County. But the Board's takeover authority includes no power retroactively to alter a reclamation plan that has been approved by a local lead agency under a certified ordinance; the Board may amend approved reclamation plans only when they were approved by the Board in the first instance because the lead agency in the jurisdiction did not have a certified ordinance or were approved by the agency under an ordinance that was not in accordance with state policy (§ 2774.5, subd. (c)). And even reclamation plans the Board amends in the exercise of this power must be remanded to the lead agency upon certification of the lead agency's ordinance (*id.*, subd. (d)).

In determining whether the Director has standing to enforce SMARA, we " 'must consider the consequences that might flow from a particular construction and should construe the statute so as to promote rather than defeat the statute's purpose and policy.' " (*Escobedo v. Estate of Snider*

---

[12] *Carsten v. Psychology Examining Com.*, *supra*, 27 Cal.3d 793, relied on by defendants, is not authority to the contrary. *Carsten* in its own terms addressed the "unique issue" presented by a board member's suing "the very board on which he or she serves as a member" (*id.* at p. 795); obviously, the relationship between the parties here is not analogous. The possibility exists, of course, that the Board may seek a writ of administrative mandate pursuant to the same general authorities under which the Director has proceeded. (Code Civ. Proc., §§ 1086, 1094.5.) We are not called upon in this case to express an opinion as to the viability of any such petition by the Board. Nor are we considering a situation in which the Director is challenging plans and assurances that were approved by the Board rather than a local lead agency. We anticipate that the Director and the Board will coordinate their efforts in situations where SMARA grants the Board authority to amend a reclamation plan.

(1997) 14 Cal.4th 1214, 1223 [60 Cal.Rptr.2d 722, 930 P.2d 979].) One possible result of the foregoing scheme, as County acknowledges, is that a SMARA violation, like County's approval of allegedly inadequate reclamation plans and financial assurances in this case, could remain in place even after the Board exercises its takeover authority.[13] Accordingly, unless we acknowledge the Director's interest in exercising his capacity to seek judicial review (Gov. Code, § 11180), such lead agency approvals could become final despite their noncompliance with SMARA standards. We thus agree with the Attorney General that the Legislature cannot have intended the Board's limited lead agency takeover authority to substitute, generally, for the Director's authority to seek judicial review of a local lead agency's approval of inadequate reclamation plans or financial assurances.

■ The statutes that permit a beneficially interested party to obtain a writ of mandate (Code Civ. Proc., § 1086) and a state department head to bring an action relating to the department's business (Gov. Code, § 11180, subd. (a)) both had been in effect many decades when the Legislature enacted SMARA.[14] The Legislature is deemed to have been aware of those laws and to have enacted SMARA in light of them. (See *Viking Pools, Inc. v. Maloney* (1989) 48 Cal.3d 602, 609 [257 Cal.Rptr. 320, 770 P.2d 732].) And the Legislature's having authorized each department head to prosecute actions concerning matters related to the business activities and subjects under the department's jurisdiction (Gov. Code, § 11180, subd. (a)), while not of itself creating the beneficial interest, nevertheless constitutes "a recognition" that such an executive ordinarily "has an interest which is proper to be determined in [such] proceedings" (*Tieberg, supra,* 243 Cal.App.2d at p. 283). Our conclusion that the Director has standing to seek judicial review of allegedly unlawful local lead agency decisionmaking thus reflects discernible legislative intent.

Third, recognizing the Director's beneficial interest in a writ of mandate accords with our prior pronouncements, and the pronouncements of other California courts, in similar situations. (See, e.g., *People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 491–492 [96 Cal.Rptr. 553, 487 P.2d 1193] [Attorney General had standing to enforce People's "beneficial right" to compel counties to pay regional planning expenses]; *Triplett, supra,* 48 Cal.App.4th at pp. 254–255 [state through Department had standing to

---

[13] While the parties' briefing indicates disagreement about the remedial utility of the Board's amendment powers in this particular case, there is no dispute that, as a general matter, a local lead agency's approval of an inadequate reclamation plan when a SMARA-compliant ordinance is in place escapes administrative review.

[14] SMARA, as previously noted, was enacted in 1975. (Stats. 1975, ch. 1131, § 11, p. 2793.) Code of Civil Procedure section 1086 was enacted in 1872 and amended in 1907. (See Stats. 1907, ch. 244, § 1, p. 307.) Government Code section 11180, derived from section 353 of the former Political Code, was enacted in 1921. (See Stats. 1921, ch. 602, § 1, p. 1022.)

seek writ, inter alia, because Department was authorized to interpret Williamson Act]; *State Board of Pharmacy v. Superior Court* (1978) 78 Cal.App.3d 641, 645–646 [144 Cal.Rptr. 320] [State Board of Pharmacy's standing to seek writ of mandate derived from its beneficial interest in proceeding to determine attorney fees]; *Tieberg, supra,* 243 Cal.App.2d at p. 284 [Director of Department of Employment had sufficient interest in Unemployment Insurance Appeals Board proceedings to justify seeking mandamus review].)

To deny the Director standing here would free surface mine operators who manage to obtain local lead agency approval of inadequate reclamation plans or financial assurances to do less than SMARA requires. If the reclamation plan does not require the operator to reclaim the site in accordance with SMARA, accomplishment of SMARA's goal of protecting public health and safety, as well as the environment, is at risk. And if the operator's financial assurances are inadequate to accomplish the reclamation plan, taxpayers are at risk of bearing the burden. Thus, the Director's standing to pursue a writ of mandate is essential to protect his—and the public's—interest in adequate reclamation, paid for by the operator.

### C. *Related Vested Use and CEQA Issues*

The Director, as earlier noted, also has contested County's vested use determination (viz., that Brunius had a vested nonconforming use and, therefore, did not require a permit; see generally §§ 2776, 2792), as well as the adequacy, under both CEQA and SMARA, of certain CEQA disclosure documentation that County submitted as part of the SMARA process. The majority below concluded the Director lacks standing to maintain these claims for essentially the same reason it concluded he lacked standing to challenge County's SMARA approvals—that SMARA defines the Director's role so as impliedly to deprive him of standing to challenge a lead agency's actions. On the grounds already reviewed at length, we reject that reasoning and, therefore, the Court of Appeal's application of it to these claims as well. For the same reasons, generally, that the Director is beneficially interested in obtaining writ review when a lead agency approves reclamation plans or financial assurances that do not comply with SMARA, he may be beneficially interested in obtaining a writ when a lead agency allegedly violates SMARA by making an erroneous vested use determination or by failing to include adequate CEQA disclosure documentation in the reclamation plan approval process.

SMARA exempts anyone with a "vested right to conduct surface mining operations prior to January 1, 1976," from obtaining a SMARA permit for such, "as long as the vested right continues and as long as no substantial changes are made in the operation except in accordance with" SMARA.

(§ 2776.) Moreover, SMARA expressly does not require "the filing of a reclamation plan for, or the reclamation of, mined lands on which surface mining operations were conducted prior to January 1, 1976." (*Ibid.*) If a local lead agency's erroneous recognition of a vested right to mine were immune from judicial review, the Department could find itself without leverage to enforce the Legislature's intention that the operator conduct and pay for reclamation.

Similarly, the resolution of the CEQA issue, in its standing aspect, depends on our conclusion respecting the Director's interest under SMARA in obtaining a writ of mandate to challenge an inadequate reclamation plan. CEQA, of course, is aimed at ensuring full disclosure of environmental impacts of projects it governs. (*County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) SMARA requires that the local lead agency, at the time it submits a reclamation plan and financial assurances to the Director for review, also submit all information regarding the project that has been prepared pursuant to CEQA. (§ 2774, subd. (c).)

All concede the Director's core SMARA role includes responsibility to review and power to comment on reclamation plans and financial assurances proposed for lead agency approval (see generally § 2774). When a local lead agency, in fulfilling its SMARA documentation responsibilities to the Director, relies, as SMARA permits it to do (see § 2774, subd. (c)), on documentation it has prepared pursuant to CEQA, but that documentation does not comply with CEQA's disclosure requirements, the Director may be deprived of the information he requires in order to fulfill his SMARA review and comment responsibilities. Unless something else in the materials alerts the Director and his staff to matters proper CEQA disclosure would have revealed, the Director will be denied the opportunity to provide comprehensive comments as he is empowered and obligated to do under section 2774, subdivision (d)(1).

In sum, the Director, under SMARA, was entitled to adequate CEQA information. If, as the Director alleges here, County failed in violation both of SMARA and CEQA to provide such, the Director has an interest in the issuance of a writ of mandate to correct the deficiency and effect the Legislature's intention that adequate CEQA disclosure inform the SMARA process.

D. *Attorney Fees*

Because we have concluded that the trial court's dismissal, on standing grounds, of the Director's SMARA and CEQA claims was erroneous, we have no occasion to address questions relating to the attorney fees award that was based on the dismissal.

*Disposition*

For the foregoing reasons, the judgment of the Court of Appeal is reversed and the cause is remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Moreno, J., concurred.