[No. D015184. Fourth Dist., Div. One. Aug. 25, 1993.]

DONNA E. MARSHALL et al., Plaintiffs and Appellants, v.
LINDA S. McMAHON, as Director, etc., et al., Defendants and
Respondents.

**COUNSEL**

Charles Wolfinger for Plaintiffs and Appellants.

Marilyn Holle and Sande Pond as Amici Curiae on behalf of Plaintiffs and Appellants,

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Charlton G. Holland III, Assistant Attorney General,

John H. Sanders and Paula L. Gibson, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**FROEHLICH, J.**—Applicants and recipients (applicants) of "in-home supportive services" under Welfare and Institutions Code[1] section 12300 et seq. challenge a Department of Social Services (Department) regulation limiting "protective supervision" to "non self-directing, confused, mentally impaired, or mentally ill persons." (Manual of Policies and Procedures, § 30-757.171, hereafter MPP.) Protective supervision is described as monitoring a person's behavior in order to safeguard that person against injury or death. The applicants filed this action for declaratory and injunctive relief and mandamus against the Department and its director, Linda S. McMahon, claiming both physically and mentally impaired applicants are entitled to in-home protective supervision. They contend the Department's policy limiting protective supervision to mentally impaired persons violates the state statutory scheme, the Federal Rehabilitation Act (29 U.S.C. § 794), and equal protection of law under the United States and California Constitutions.

The court found the regulation limiting protective supervision to "non self-directing" or otherwise mentally infirm persons is reasonable and consistent with the goal of in-home support services to prevent inappropriate institutionalization of aged, blind, and disabled persons. The court further found the regulation does not deny services solely on the basis of handicap and does not violate equal protection because the two classes of applicants have different needs. We agree and affirm the judgment.

### THE LEGISLATIVE SCHEME

In 1973 the Legislature enacted the In-Home Supportive Services (IHSS) program to enable aged, blind or disabled poor persons to avoid institutionalization by remaining in their homes with proper supportive services.[2] (§ 12300 et seq.) Supportive services are described in discrete categories, such as "domestic services," "heavy cleaning," "yard hazard abatement," etc. The service in question in this appeal is "protective supervision." (§ 12300.) Severely impaired recipients may receive up to 283 service hours per month;

---

[1]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]The enactment qualified California for 75 percent federal matching funds under title XX of the Social Security Act. (See *County of Sacramento* v. *State of California* (1982) 134 Cal.App.3d 428, 430-431 [184 Cal.Rptr. 648].)

nonseverely impaired recipients are limited to 195 hours or less per month. (§ 12303.4, subds. (a)(1) and (b)(1).)

Under the statutory scheme, the Department is charged with administering the IHSS program in compliance with state and federal laws. (§§ 12301, 12301.1, 12302; *Miller* v. *Woods* (1983) 148 Cal.App.3d 862, 868 [196 Cal.Rptr. 69].) It promulgates regulations to implement the statutes, and the county welfare departments operate the program under the state's general supervision. The regulations must "establish[ ] a uniform range of services available to all eligible recipients based upon individual needs. . . ." (§ 12301.1.)

The Department established the current protective services regulations in 1979. The regulations provide in part:

"30-757 PROGRAM CONTENT

.1 Only those services specified below shall be authorized through IHSS.

"· . . . . . . . . . . . . . . . . . . . . . . .

".17 Protective supervision consisting of observing recipient behavior in order to safeguard the recipient against injury, hazard, or accident.

".171 This service is available for monitoring the behavior of non self-directing confused, mentally impaired, or mentally ill persons, with the following exceptions:

"(a) Protective supervision does not include friendly visiting or other social activities.

"(b) Supervision is not available when the need is caused by a medical condition and the form of the supervision required is medical.

"(c) Supervision is not available in anticipation of a medical emergency.

"(d) Supervision is not available to prevent or control anti-social or aggressive recipient behavior." (MPP subd. 30-757.) A county's determination of services to be provided is reviewable by hearing before the state Department at the recipient's or provider's request. (§ 10950.)

FACTUAL AND PROCEDURAL BACKGROUND

Ninety-four-year-old Donna Marshall[3] applied for IHSS in 1987. The county[4] authorized 104.10 hours of services per month based on Marshall's "general weakness due to old age, urinary incontinence and deafness." Authorized services included meal preparation, laundry, shopping, transportation and "non-medical personal services" consisting of bathing, grooming, dressing, ambulation, hygiene, etc. Marshall's request for 24-hour protective supervision was denied on the basis she was alert and not mentally impaired. The Department noted protective supervision was not available in anticipation of a medical emergency.

After unsuccessful administrative review, Marshall filed this action along with her "IHSS provider" son Gary Marshall and the Welfare Rights Organization of San Diego, Inc. The court certified the suit as a class action on behalf of all applicants, recipients and their providers who have been denied protective supervision services solely because their need arises from a physical impairment. On stipulated facts, the court upheld the regulation as consistent with the statutory scheme on June 19, 1991. This appeal followed.

DISCUSSION

In order to determine whether the applicants are properly or improperly denied protective supervision, we must understand what the service is in practical terms. The regulations describe protective supervision as "observing recipient behavior in order to safeguard the recipient against injury, hazard, or accident." That description appears to be incomplete, however, because the person providing the care must necessarily be in a position to intervene in some manner to prevent harm when the disabled person engages in potentially dangerous conduct.

The applicants refer to protective supervision as a generalized "monitoring." The Department defines protective supervision as filling the void of what persons cannot do: "observe their own behavior." The Department gives examples of the mentally impaired who are inherently incapable of understanding certain dangers, such as playing with matches, immersing electrical appliances in water, or wandering away from home. The court concluded protective supervision is "the unskilled observation of non self-directing or otherwise mentally impaired persons who cannot observe their

---

[3]Counsel informs us Donna Marshall died during the pendency of the appeal. In light of the class certification and continuing public interest in in-home support services, we conclude resolution on this record is appropriate. (*Daly v. Superior Court* (1977) 19 Cal.3d 132, 141 [137 Cal.Rptr. 14, 560 P.2d 1193].)

[4]Los Angeles County.

own behavior or surroundings and who are at risk of harm." "Protective supervision" appears to be similar to care given small children, that is, anticipating everyday hazards and intervening to avert harm.

The applicants contend persons with certain physical impairments, such as breathing problems or frequent strokes, also require continuous care and should be given protective supervision to live safely at home. They attack the Department's regulation prohibiting protective supervision for physically impaired recipients on three grounds, as follows:

*Statutory Challenge*

The applicants first claim there is no statutory basis for distinguishing between the needs of the physically and mentally impaired in the context of protective supervision. They argue regulation MPP section 30-757.171 is inconsistent with IHSS statutes basing services on individual need regardless of the type of impairment, it conflicts with IHSS legislative history, and it undermines IHSS goals. The applicants argue the absence of any statutory language differentiating between physical and mental impairments prohibits the Department from making such a distinction.

The Department responds by contending that physically impaired persons do not need protective supervision because they are capable of observing their own behavior and surroundings and their physical needs are met by the other types of services. Both parties agree that the eligibility test for a particular in-home service is that the person be "unable to perform the services" for himself.

Where a statute empowers an administrative agency to adopt regulations, such regulations "must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose." (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 679 [94 Cal.Rptr. 279, 483 P.2d 1231]; Gov. Code, § 11342.2.) In determining the proper interpretation of a statute and the validity of an administrative regulation, the agency's construction is entitled to great weight and if there appears to be a reasonable basis for it, a reviewing court will not substitute its judgment for that of the administrative body. (*Ontario Community Foundations, Inc.* v. *State Bd. of Equalization* (1984) 35 Cal.3d 811, 816 [201 Cal.Rptr. 165, 678 P.2d 378].) The role of the reviewing court is limited to the legality of the challenged regulation, not its wisdom. (*Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 355 [185 Cal.Rptr. 453, 678 P.2d 378].) In construing state statutes vis-à-vis administrative regulations, a court should look first to the language, then to the legislative history, and finally to the general principles

and policies underlying the statutory scheme. (*Miller* v. *Woods* (1983) 148 Cal.App.3d 862, 876-877 [196 Cal.Rptr. 69].)

"Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations." (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].) On review, the burden of proof is on the party challenging the regulation, because the administrative agency's action comes before the court with a presumption of correctness and regularity. (*Credit Ins. Gen. Agents Assn.* v. *Payne* (1976) 16 Cal.3d 651, 657 [128 Cal.Rptr. 881, 547 P.2d 993].)

Here, the Legislature did not define "protective supervision" or any other enumerated service in section 12300, with the exception of "paramedical services" as defined in section 12300.1.[5] " '[T]he absence of any specific [statutory] provisions regarding the regulation of [an issue] does not mean that such a regulation exceeds statutory authority . . . .' [Citations.] The [agency] is authorized to 'fill up the details' of the statutory scheme. [Citation.]" (*Ford Dealers Assn.* v. *Department of Motor Vehicles, supra,* 32 Cal.3d 347, 362.) By necessity the Department had to set perimeters for this and other services in order to fulfill its mandate and oversee uniform application by the counties.

Since 1979 the Department has had limited eligibility for protective supervision on "non self-directing, mentally ill or mentally infirm" persons irrespective of other infirmities. The Department asserts the restriction is logical because the physical needs of the recipient are met by the other services and protective supervision will not prevent a medical emergency. We agree. As the trial court correctly noted, not all persons who are aged, blind or disabled can be maintained at home with unskilled IHSS services. Some will require skilled nursing or institutionalization. From a practical viewpoint, the Department cannot provide all services for every need of every aged, blind or disabled person to enable that person to remain at home.

---

[5]Former section 12300.1 provided: "As used in Section 12300 and in this article, 'supportive services' include those necessary paramedical services which are ordered by a licensed health care professional who is lawfully authorized to do so, which persons could provide for themselves but for their functional limitations. These necessary services shall be rendered by a provider under the direction of a licensed health care professional, subject to the informed consent of the recipient obtained as a part of the order for service. Remuneration of providers under the fourth paragraph of Section 12300 shall also be paid for paramedical services. Any and all references to Section 12300 in any statute heretofore or hereafter enacted shall be deemed to be references to this section. All statutory references to the supportive services specified in Section 12300 shall be deemed to include paramedical services." The Legislature amended section 12300.1 by Statutes 1992, chapter 939 to further define "paramedical services."

It can only provide the enumerated services. The limitation of protective supervision to the "non self-directing, mentally ill or mentally infirm" is reasonable because a nonskilled provider is able to supply the "common sense" or missing cognitive skill to prevent harm from everyday hazards. Conversely, a nonskilled provider is unable effectively to avert a medical emergency requiring skilled care.

The Department points out the Legislature has twice failed to pass bills introduced in 1988 and 1989 to define "protective supervision" and extend it to persons on various types of life-support equipment.[6] Although many factors may come into play in the failure of a particular bill, the Legislature was made aware of the manner in which the Department has implemented protective supervision and, for whatever reason, left it in place. ██ ██ This could permit the inference that the Legislature views the in-place regulations as consistent with its mandate.[7] We conclude the regulations are consistent with the statutory scheme to provide uniform homemaker-type services to prevent inappropriate institutionalization.[8]

---

[6]Senate Bill No. 1794 (Jan. 20, 1988) proposed section 12300 be amended to provide in relevant part: "For purposes of this chapter, 'protective supervision' includes, but is not limited to, monitoring the behavior or physical condition of mentally or physically disabled recipients, who by reason of physical or mental impairment, require the constant observation, continued presence, or immediate assistance of another person in order to safeguard the recipient against injury, hazard, or accident. Persons in need of protective supervision shall include, but are not limited to, persons who by reason of a mental or physical impairment are unable to summon assistance themselves, are frequently or periodically in need of authorized paramedical care services or personal care services which must be provided in order to ensure their safety, or are in need of personal assistance or assistance with life support equipment periodically during a 24-hour period."

Senate Bill No. 376 (Feb. 6, 1989) contained identical text concerning protective supervision, with the exception of the last sentence providing: "Persons in need of protective supervision shall include, but are not limited to, persons who by reason of a mental or physical impairment are unable to summon assistance themselves, or are frequently or periodically in need of paramedical or nonmedical personal care services which must be provided on a 24-hour basis to ensure the recipients' safety."

[7]We do not place great emphasis on this point, being mindful of the general rule that " ' "[a]s evidences of legislative intent [unpassed bills] have little value." ' " (*State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1979) 88 Cal.App.3d 43, 63 [152 Cal.Rptr. 153], quoting *Miles* v. *Workers' Comp. Appeals Bd.* (1977) 67 Cal.App.3d 243, fn. 4 [136 Cal.Rptr. 508] and *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 58 [69 Cal.Rptr. 480].)

[8]The applicants also claim amendments to IHSS statutes during the course of this appeal (Assem. Bill No. 1773 [Stats. 1992, ch. 939, § 7] and Sen. Bill No. 485 [Stats. 1992, ch. 722, § 51]), requiring the IHSS program to be operated as part of the federal Medicaid scheme, will "prohibit[ ] any total ban on protective supervision for physical impairments." Relying on *Cowan* v. *Myers* (1986) 187 Cal.App.3d 968, 978 [232 Cal.Rptr. 299], the applicants argue once the state agrees to cover certain types of services, it may not exclude covered services

*Federal Rehabilitation Act*

The applicants next contend the protective supervision regulations violate disability discrimination provisions in section 504 of the federal Rehabilitation Act of 1973 (29 U.S.C.A. § 794) (Rehabilitation Act). They argue they are being denied benefits solely on the basis of physical disability.

■ Claims of discriminatory motive and disparate-impact discrimination may be brought under the Rehabilitation Act. (*Alexander* v. *Choate* (1985) 469 U.S. 287, 309 [83 L.Ed.2d 661, 677, 105 S.Ct. 712].) The person alleging discrimination has the initial burden of establishing a prima facie case that he is "otherwise qualified" to participate in the federally funded program. (*Norcross* v. *Sneed* (8th Cir. 1985) 755 F.2d 113, 117.)

The Rehabilitation Act provides in part: "No otherwise qualified handicapped individual in the United States, as defined in section 706(8)[9] of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." (29 U.S.C.A. § 794(a).) ■ It is undisputed here the applicants are disabled within the meaning of the Rehabilitation Act and the IHSS program receives substantial federal funding under the title XX social services block grant program. However, the applicants are not "otherwise qualified" for protective supervision services because, as noted above, they do not have the same functional inability to care for themselves as those with mental impairments. Applicants lacking the ability to "self-direct" are eligible for protective supervision whether or not they have physical impairments. We conclude the protective supervision regulations do not discriminate against qualified disabled individuals.

*Equal Protection of the Laws*

Finally, the applicants contend the protective supervision regulations violate the equal protection clause of article I, section 7 of the California Constitution and the Fourteenth Amendment to the United States Constitution because the regulations create a "physical-mental impairment classification . . . that has no permissible legislative purpose."

---

for one particular condition where the physician determines the treatment is necessary. The recent amendments have yet to be implemented and do not facially alter the scope of protective supervision. As noted above, the applicants are denied protective supervision not because of a particular condition, but because they have not established a need for the service.

[9]As pertinent to this program, a "disabled individual" is "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." (29 U.S.C.A. § 706(8)(B).)

■ "[T]he concept of equal protection of the laws means simply 'that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.'" (*People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 502 [96 Cal.Rptr. 553, 487 P.2d 1193], quoting *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 643].) ■ Two standards of review apply to questions of equal protection. The basic and conventional standard for reviewing social welfare legislation in which there is differential treatment between classes or individuals requires only that the legislation have some "reasonable basis" or bear some "rational relationship" to a conceivable legitimate state purpose. (*Schwalbe* v. *Jones* (1976) 16 Cal.3d 514, 518 [128 Cal.Rptr. 321, 546 P.2d 1033], overruled on other grounds by *Cooper* v. *Bray* (1978) 21 Cal.3d 841, 846 [148 Cal.Rptr. 148, 582 P.2d 604].) The second standard, "strict scrutiny," applies only to a classification drawn along lines which render it "suspect" in constitutional terms or touches a "fundamental interest." (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 17-18 [112 Cal.Rptr. 786, 520 P.2d 10].) ■ Although aged, disabled, mentally ill, retarded or infirm persons may have immutable disabilities, they are not a "suspect" class. (See *Cleburne* v. *Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 445-446 [87 L.Ed.2d 313, 323-324, 105 S.Ct. 3249]; *Adoption of Kay C.* (1991) 228 Cal.App.3d 741, 753-754 [278 Cal.Rptr. 907].)

■ Here, IHSS provides services based on individual need. The basis for denying protective supervision to mentally alert, self-directing applicants bears a rational relationship to the purpose of the program—to prevent inappropriate institutionalization—because the alert applicant has the cognitive ability to understand everyday hazards. The class of applicants here is not similarly situated to those persons unable to "self-direct" their living activities. This is not the situation presented in *Miller* v. *Woods, supra*, 148 Cal.App.3d 862, 881, where persons seeking in-home services had identical needs requiring identical care, but the Department's regulations denied protective supervision if the person had an adult living in the same household. Here the class of applicants is not similarly situated to those persons unable to self-direct their living activities.

Applicants strenuously argue that it is arbitrary to deny 24-hour "protective supervision" to individuals whose disability is physical when such protection is afforded to similarly disabled people whose disability can be characterized as mental. Persons unable to anticipate a life-threatening event, such as a stroke, seizure or heart attack, should receive uniform protection regardless of the source of the disability. This argument overlooks two facets of the services we find important.

The first is that, as reviewed above, the in-home supportive service program is not designed to provide a full range of services to disabled people

who can remain in their homes. The services provided are designed to meet specific needs which the Legislature has elected to satisfy.[10] There is no provision for dental services, for instance—even emergency dental service. The purpose of "protective supervision" is to provide assistance by unskilled providers to "non self-directing people." There is simply no category of aid which is directed to providing constant oversight for disabled people who *are* self-directed (i.e., who know what their physical or mental problems are and who ordinarily can watch out for themselves), even though emergency situations can befall them which might make beneficial the constant oversight. To pay someone to watch a susceptible person to avoid danger from fainting spells, seizures or strokes might in a sense be quite beneficial. The short answer is that this is not one of the services the statute provides.

We find nothing in the federal Americans with Disabilities Act (tit. 42 U.S.C.A. § 12101 et seq.), or otherwise, which precludes a limitation of services to the specific categories set forth in section 12300. Title 42 United States Code Annotated section 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the . . . programs . . . of a public entity." However, 42 United States Code Annotated section 12131(2) provides that a "qualified individual with a disability" means a person who meets the eligibility requirements for participation in the programs which the public entity has elected to provide. Merely being disabled does not constitute eligibility for state aid. The disabled person must require a service in the category of services the state offers.

The official analysis of the federal regulations adopted to implement the act supports this conclusion.[11] As set forth therein: "Because coverage under this part is not limited to federally assisted programs, paragraph (c) has been

---

[10]The specific, discrete categories of assistance provided in former section 12300 are: "domestic services, heavy cleaning, nonmedical personal services, accompaniment by a provider when needed during necessary travel to health-related appointments or to alternative resource sites and other essential transportation as determined by the director, yard hazard abatement, protective supervision, teaching and demonstration directed at reducing the need for other supportive services, and paramedical services. . . ." The Legislature amended section 12300 by Statutes 1992, chapter 163. The new section lists specific discrete categories of assistance as follows: "(1) Assistance with ambulation. (2) Bathing, oral hygiene, and grooming. (3) Dressing. (4) Care and assistance with prosthetic devices. (5) Bowel, bladder, and menstrual care. (6) Repositioning, skin care, range of motion exercises, and transfers. (7) Feeding and assurance of adequate fluid intake. (8) Respiration. (9) Assistance with self-administration of medications."

[11]We have not addressed in detail or directly the arguments of amici curiae, which are based on their construction of the federal anti-discrimination statutes. As may be obvious, however, we do not accept amici's arguments. Section 504 of the Rehabilitation Act, 29 United States Code Annotated section 794, has been in effect throughout the existence of the IHSS program, and we take notice that the federal government during this period of many

revised to clarify that State and local governments may provide special benefits beyond those required by the nondiscrimination requirements of this part, that are limited to individuals with disabilities or a particular class of individuals with disabilities, without thereby incurring additional obligations to persons without disabilities or to other classes of individuals with disabilities."[12]

Our second approach to this argument focuses on the program regulations and their apparent administration. As set forth above in detail, the regulations provide for protective supervision for people who are "non self-directing, confused, mentally impaired, or mentally ill." Literally, therefore, a person who is "non self-directing" because of a physical rather than a mental ailment (assuming this is practically possible, as amici assert) is eligible for protective supervision. In other words, the regulations do *not*, as applicants and amici contend, draw a bright line between those who are physically and those who are mentally incapacitated. The line is drawn between those who have the practical capacity to know when they are in trouble and those who do not. Counsel from the Attorney General's office earnestly represented to the court, both at oral argument and in post-argument briefing, that the administration of the IHSS program does not flatly exclude individuals whose disability is, for some medical or technical reason, described as physical rather than mental. If a person for any reason is "non self-directing," that person is eligible for protective services.

To conclude: We find that it does not violate state law, federal law or constitutional law to provide a limited range of services to disabled people; that it is permissible to limit the in-home supportive service denoted as "protective supervision" to only those disabled people who are so unaware of their being and conduct as to require nonmedical oversight, akin to baby-sitting; and that even though similar constant watchfulness of alert but otherwise endangered disabled people might be beneficial, the state is not constitutionally required to provide it.

### DISPOSITION

The judgment is affirmed.

Todd, J., concurred.

---

years has never taken steps to deny, terminate or challenge funding of the program on the ground of discrimination. We find nothing in the recently adopted Americans with Disabilities Act (42 U.S.C.A. § 12101 et seq.) which would alter the anti-discriminatory provisions of section 504 of the Rehabilitation Act (see 28 C.F.R. § 35.103 (1992)). We reject the suggestion that anything to the contrary is to be found in the federal Medicaid law. (42 U.S.C.A. § 1396 et seq.)

[12]See Section-by-Section Analysis, 28 Code of Federal Regulations part 35, appendix A (1992) section 35.130.

**WIENER, Acting P. J.,** Dissenting.—Almost 20 years ago California established the In-Home Supportive Services (IHSS) program "to enable aged, blind or disabled poor to avoid institutionalization by remaining in their homes with proper supportive services." (*Miller* v. *Woods* (1983) 148 Cal.App.3d 862, 867 [196 Cal.Rptr. 69]; see Welf. & Inst. Code § 12300 et seq.[1]) By definition, IHSS recipients "cannot safely remain in their homes . . . unless these services are provided." (§ 12300, subd. (a).) The purposes underlying the program, part social and part fiscal, are a function of the problems associated with institutionalization, the necessary alternative if the supportive services were not available. Socially, recipients are more comfortable in familiar surroundings which contribute to their physical and psychological well being. Fiscally, institutionalization costs far more than providing supportive services in the home.

The challenged Department of Social Services (DSS) regulation singles out one of the enumerated support services, "protective supervision," and denies it to anyone other than persons with a mental disability. Having defined protective supervision as "monitoring behavior," DSS suggests that concept can be further defined as providing the cognitive behavior control which certain mentally impaired persons lack. Analogizing it to other IHSS support services, DSS points out that persons without yards obviously do not need "yard hazard abatement" and persons without a prosthesis clearly do not require "[c]are and assistance with prosthetic devices." (§ 12300, subds. (b) and (c).) Therefore, it concludes, only the mentally impaired need protective supervision. Respectfully, the DSS argument is a bit like defining a "yard" to be a "lawn" and denying yard hazard abatement services to anyone with trees or shrubs.

DSS does *not* assert that it is only mentally disabled persons "who cannot remain safely in their homes" unless protective supervision is provided. Plaintiffs identify various categories of individuals whose physical disabilities create risks (e.g., falls, choking, strokes, seizures) which require virtually 24-hour monitoring. While conceding these risks exist, DSS contends they are properly characterized as potential medical emergencies. Protective supervision, it argues, can be provided only for persons "who are unable to perform the services themselves." (§ 12300, subd. (a).) DSS maintains that responding to a medical emergency is not the sort of protective supervision contemplated by the Legislature because generally no person, whether or not disabled, can respond to their own medical emergency.

DSS's argument fails to appreciate the conjunctive nature of the statutory requirements. Services under the IHSS program are available only to persons

---

[1] All statutory references are to the Welfare and Institutions Code.

"who are unable to perform the services themselves *and* who cannot safely remain in their homes . . . unless these services are provided." (§ 12300, subd. (a), italics added.) It is true that individuals left by themselves might always be subject to medical emergencies where they would be better off if someone else was present to call paramedics or otherwise remedy the dangerous situation. In most cases, however, the risk is not so great that the person cannot otherwise "safely remain in their home[]." But where an eligible individual's physical disability creates a risk so serious that they cannot otherwise remain in their home,[2] protective supervision is authorized by the statute.[3] The alternative—unnecessary institutionalization—is the exact vice the IHSS program was designed to avoid.

The majority opinion recognizes that interpretive regulations must be "consistent and not in conflict with the statute and reasonably necessary to effectuate [its] purpose . . . ." (Gov. Code, § 11342.2.) The mere fact that the Legislature did not expressly define "protective supervision" does not authorize DSS to administratively deny these services to otherwise eligible individuals in a manner inconsistent with the purposes underlying the IHSS program. (See *Horn* v. *Swoap* (1974) 41 Cal.App.3d 375, 381 [116 Cal.Rptr. 113].) Here DSS does not dispute there is a category of individuals with physical disabilities who will be unable to safely remain in their homes without protective supervision. There is no reasonable interpretation of the IHSS enabling statutes which would deny these persons those critical services, and an administrative regulation purporting to do so is necessarily invalid.

A petition for a rehearing was denied September 15, 1993, and appellants' petition for review by the Supreme Court was denied November 17, 1993. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

[2]I view it as within DSS's administrative responsibilities to promulgate regulations which define the degree of risk necessary before individuals will be deemed unable to "safely remain in their homes . . . unless these services are provided."

[3]The majority opinion cites no authority for the proposition that a nonskilled provider of protective supervision services must be able to "avert" the medical emergency. (Maj. opn., *ante*, p. 1849.) Where all an individual needs to avoid institutionalization is the presence of someone who can alert medical personnel in the event of an emergency, "common sense" and the purpose underlying the statute suggest that such services should be provided.