[No. C049201. Third Dist. Apr. 12, 2006.]

MINERAL ASSOCIATIONS COALITION et al., Plaintiffs and Appellants,
v.
STATE MINING AND GEOLOGY BOARD, Defendant and Respondent.

576

## Counsel

Downey Brand, Patrick G. Mitchell, Michael N. Mills and Joseph S. Schofield for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Tom Greene, Mary E. Hackenbracht, Assistant Attorneys General, and Ralph L. Venturino, Deputy Attorney General, for Defendant and Respondent.

## Opinion

**BUTZ, J.**—This case presents the question of whether defendant State Mining and Geology Board (the Board), which operates within the California Department of Conservation, exceeded its authority in promulgating an administrative regulation requiring that the Director of the Department of Conservation (the Director) concur in any lead agency determination that a mine operator has fulfilled the terms and conditions of his reclamation plan and that the financial assurance instruments securing his obligation to reclaim lands shall be released.

Plaintiffs Mineral Associations Coalition, California Mining Association, Construction Materials Association of California and Southern California Rock Products Association (collectively, the Associations) filed this declaratory relief action, seeking a judicial declaration that California Code of Regulations, title 14, section 3805.5, subdivision (d) (regulation 3805.5(d))[1] was invalid because it was in conflict with the Surface Mining and Reclamation Act of 1975 (SMARA) (Pub. Resources Code, § 2710 et seq.),[2] and therefore in excess of the Board's rulemaking authority. The trial court granted the Board's motion for judgment on the pleadings, ruling that the challenged regulation was within the Board's authority and consistent with SMARA.

We agree with the trial court. As the California Supreme Court recently observed in *People ex rel. Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971 [32 Cal.Rptr.3d 109, 116 P.3d 567] (*El Dorado*), the Director has both the authority and responsibility to ensure that mined lands are reclaimed in accordance with an approved reclamation plan and that financial assurances are not released prematurely. Moreover, we discern no clear legislative intent that lead agencies should have exclusive power to determine whether mined lands have been adequately reclaimed as would justify releasing the mine operator from further financial liability. We shall affirm the judgment.

---

[1] Unspecified regulation references are to title 14 of the California Code of Regulations.

[2] Undesignated statutory references are to the Public Resources Code.

■■■■■■■■■■■■

## BACKGROUND

### A. *Overview of SMARA and Provisions for Governmental Enforcement*

SMARA was enacted by the Legislature in recognition that "the extraction of minerals is essential to the continued economic well-being of the state and to the needs of the society, and that the reclamation of mined lands is necessary to prevent or minimize adverse effects on the environment and to protect the public health and safety." (§ 2711, subd. (a).) "Reclamation" is a process of land treatment that minimizes damage to the environment from surface mining operations and restores the land to usable condition. (§ 2733.)

As noted in *El Dorado*, " '[w]ithin the [state] Resources Agency is the Department of Conservation (the Department). The head of the Department is an executive officer appointed by the Governor, known as the Director. (§ 601.) The Department's work is divided into at least four divisions: mines and geology; oil, gas, and geothermal resources; land conservation; and recycling. (§ 607.) [¶] Also in the Department is the [Board]. (§ 660.) . . . The Board represents the state's interests in the development, utilization, and conservation of mineral resources in California and the reclamation of mined lands, and in federal matters pertaining to mining. The Board also determines, establishes, and maintains an adequate surface mining and reclamation policy. (§ 672.)' " (*El Dorado, supra,* 36 Cal.4th at p. 983.)

" 'At the heart of SMARA is the requirement that every surface mining operation have a permit, a reclamation plan, and financial assurances. (§ 2770, subd. (a).)[3] . . . The financial assurances must remain in effect for the duration of the mining operation and until reclamation is complete and shall be made payable to the lead agency and the Department. (§ 2773.1, subd. (a)(2).) The financial assurances may be forfeited if the lead agency or the Board determines the operator is financially incapable of performing reclamation in accordance with the approved reclamation plan, or has abandoned [his] surface mining operation without commencing reclamation. (§ 2773.1, subd. (b).) [¶] In keeping with the recognition of the diverse conditions throughout the state, SMARA provides for "home rule," with the local lead agency having primary responsibility. A lead agency is usually the city or county. (§ 2728.) The mining operator submits the reclamation plan and financial assurances to the lead agency for review. (§ 2770, subd. (d); § 2772.) The Board, through regulations, specifies minimum statewide reclamation standards. (§ 2773.)' "

---

[3] Financial assurances may take the form of surety bonds, irrevocable letters of credit, trust funds, or other forms of assurances specified by the Board, which are determined to be adequate to perform reclamation in accordance with an approved reclamation plan. (§ 2773.1, subd. (a)(1).)

(*El Dorado, supra,* 36 Cal.4th at p. 984.) Every lead agency must adopt ordinances in accordance with state policy. (§ 2774, subd. (a).) The Board must review these ordinances and certify that they comply with that policy. (§ 2774.3.)

Prior to approving a reclamation plan, the lead agency must send the plan, financial assurances and supporting documentation to the Director. (§ 2774, subd. (c).) " 'The Director then may prepare written comments, if he chooses, within 30 days for reclamation plans and 45 days for financial assurances. (§ 2774, subd. (d)(1).) The lead agency shall prepare written responses to the Director's comments, describing disposition of the major issues raised. In particular, the lead agency shall explain in detail why any specific comments and suggestions were not accepted. (§ 2774, subd. (d)(2).) Thus, although the lead agency must evaluate and respond to the Director's comments, it need not always accept them.' " (*El Dorado, supra,* 36 Cal.4th at p. 985.)

Initially, SMARA contained no enforcement provisions. (*El Dorado, supra,* 36 Cal.4th at p. 985.) However, " '[i]n 1990, in response to concerns about deficiencies of lead agencies in carrying out their responsibilities under SMARA, the Legislature substantially amended SMARA. The amendments provided for various types of enforcement, against both mine operators and lead agencies. Enforcement against mine operators includes notices of violations and fines. (§ 2774.1, subds. (a)–(c).) The lead agency has primary responsibility for enforcing SMARA against mine operators. (§ 2774.1, subd. (f)(1).) Where the Board is not acting as the lead agency, the Director may initiate enforcement actions where (1) the Director has notified the lead agency of the violation and the lead agency fails to take action within 15 days, or (2) the Director determines the violation amounts to imminent and substantial endangerment to the public health or safety, or to the environment. ([*Ibid.*]) Similarly, the Director may take actions to seek forfeiture of financial assurances where the lead agency has failed to act or has been unsuccessful. (§ 2773.1, subd. (d).)' " (*El Dorado, supra,* 36 Cal.4th at p. 985.)

The Board is given statutory authority to adopt financial assurance mechanisms that it determines are "reasonably available and adequate to ensure reclamation." (§ 2773.1, subd. (e).) It may also step into the shoes and assume the role of the lead agency if it finds that the lead agency has not been fulfilling its statutory duties according to SMARA. (§ 2774.4.)

## B. *The Regulation at Issue*

Through section 2755, the Legislature has directed the Board to "adopt regulations that establish state policy for the reclamation of mined lands in accordance with the [general provisions set forth in SMARA]." (Amended by Stats. 2004, ch. 183, § 285.)

Section 2773.1 provides that financial assurances shall no longer be required upon "notification" by the lead agency to the mining operator (§ 2731) that reclamation has been completed according to an approved reclamation plan (§ 2773.1, subd. (c)). In furtherance of this provision, in May 2004 the Board enacted the challenged regulation 3805.5(d), which provides: "Prior to sending written notification and release of financial assurances as provided under [section 2773.1], the lead agency *shall obtain written concurrence of the director* that the completion of reclamation of the mined land disturbed by the surface mining operation is in accordance with the requirements of the lead agency-approved reclamation plan." (Italics added.)

## PROCEDURAL HISTORY

In September 2004, the Associations filed this action for injunctive and declaratory relief, seeking a judicial declaration that regulation 3805.5(d) was invalid, and an injunction barring its enforcement. Attached to the complaint was an analysis dated July 10, 2003, from the Legislative Counsel's office, concluding that "[a] proposal by the [B]oard [now regulation 3805.5(d)] to require the lead agency to obtain the concurrence of the [D]irector before releasing financial assurances, in our opinion, is not within the ambit of the authority conferred on the [B]oard by [SMARA]," primarily because the statutory scheme grants the Director only an "advisory role" in lead agency decisions.

Each side filed motions for judgment on the pleadings. The trial court, after granting both parties' request for judicial notice, granted the Board's motion and denied the Associations' motion. Disagreeing with the opinion of Legislative Counsel, the court ruled that the regulation was consistent with SMARA and not in excess of the Board's rulemaking authority.

The Associations appeal from the judgment.

## DISCUSSION

### I. General Principles

In reviewing the validity of an administrative regulation, the court's task is twofold: First, the court asks " 'whether the [agency] exercised [its] quasi-legislative authority within the bounds of the statutory mandate.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 16 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (conc. opn. of Mosk, J.) (*Yamaha*), quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697] (*Morris*).) "[R]egulations that alter or amend the statute or enlarge or impair its scope are void." (*Physicians & Surgeons Laboratories, Inc. v. Department*

*of Health Services* (1992) 6 Cal.App.4th 968, 982 [8 Cal.Rptr.2d 565] (*Physicians & Surgeons*), citing *Henning v. Division of Occupational Saf. & Health* (1990) 219 Cal.App.3d 747, 757–758 [268 Cal.Rptr. 476].)

If the regulation passes the first test, the court proceeds to a second line of inquiry: whether the regulation is " ' "reasonably necessary to effectuate the purpose of the statute." . . . In making such a determination, the court will not "superimpose its own policy judgment upon the agency in the absence of an arbitrary and capricious decision." ' " (*Yamaha, supra,* 19 Cal.4th at pp. 16–17 (conc. opn. of Mosk, J.), quoting *Morris, supra,* 67 Cal.2d at pp. 748–749; accord, see *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 109 [126 Cal.Rptr.2d 441] (*Communities*).)

## II. Is Regulation 3805.5(d) Consistent with SMARA?

■ Where an agency has the authority to adopt regulations to implement or carry out a legislative scheme, any regulation so adopted must be "consistent and not in conflict with the statute." (Gov. Code, § 11342.2; see *City of San Jose v. Department of Health Services* (1998) 66 Cal.App.4th 35, 41–42 [77 Cal.Rptr.2d 609].) An administrative agency has no authority to promulgate a regulation that is inconsistent with controlling law. (*Communities, supra,* 103 Cal.App.4th at pp. 109–110.)

While it is true that " '[t]he court, not the agency, has "final responsibility for the interpretation of the law" under which the regulation was issued' " (*Communities, supra,* 103 Cal.App.4th at p. 110), the standard governing our resolution of the issue is one of "respectful nondeference." (*Physicians & Surgeons, supra,* 6 Cal.App.4th at p. 982; *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1011, 1022 [50 Cal.Rptr.2d 892].)

The Associations assert that regulation 3805.5(d), which requires the Director's concurrence before a lead agency approves reclamation and releases financial assurances, conflicts with SMARA because (1) the statutory scheme gives the lead agency *sole discretion* in determining whether reclamation has occurred in compliance with the reclamation plan, and (2) the Director's role in enforcing SMARA is "purely advisory." Both of these premises are wrong.

Addressing the second argument first, the thesis advanced by the Associations that SMARA accords the Director only a limited "advisory" enforcement role is based mainly on section 2774, which provides that, before a lead agency approves a proposed reclamation plan and financial assurances, the operator's documentation must be forwarded to the Director for comments and

suggestions; and, as noted in *El Dorado*, while the agency must respond in writing to each of these comments and recommendations, it is not legally bound to follow them. (§ 2774, subds. (c), (d)(1) & (2); *El Dorado, supra,* 36 Cal.4th at pp. 984–985.)

But the fact that the Director has an advisory role before mining operations have begun does not mean that his interest in enforcement *after they have commenced* is strictly that of an advisor. The California Supreme Court emphatically rejected that notion in *El Dorado*, a case not available to the trial judge when he ruled, but which strongly supports his decision.

In *El Dorado*, El Dorado County (the lead agency), through its planning commission and board of supervisors, had approved a reclamation plan and financial assurances for a mine operator despite the Director's objection to their adequacy. (*El Dorado, supra,* 36 Cal.4th at p. 982.) The Director filed petitions for writ of administrative mandate seeking to overturn the County's approvals as undertaken in violation of SMARA. The County demurred to the petition on the ground that the Director lacked standing. (36 Cal.4th at p. 982.) This court ruled for the County, concluding that the Director did not have a beneficial interest in the approval process because SMARA granted him only a "limited advisory role," especially when compared with the Board's power to oversee wayward lead agencies. (36 Cal.4th at pp. 983, 986–987.)

A unanimous state Supreme Court reversed. The court first pointed out that, even though the Director's *initial* role is advisory in nature, his "powers and responsibilities under SMARA are not limited to advice and comment." (*El Dorado, supra,* 36 Cal.4th at pp. 989–990.) Specifically, the Director (1) has the power to inspect any mining operation, and if he determines the operation is not in compliance with SMARA, may order the mining operator to comply; (2) if, after a hearing before the board, the operator is found out of compliance, the Director may impose administrative penalties of up to $5,000 per day; (3) upon a determination that a violation presents an imminent and substantial danger to the public health or the environment, the Director may request that the Attorney General, on his behalf, seek an injunction against the operation; and (4) upon the Director's complaint, the Attorney General may bring an action to recover administrative penalties against violators. (36 Cal.4th at p. 990.) The Supreme Court continued: "Plainly, these broad enforcement powers and responsibilities, directed as they are towards overall SMARA compliance and the fulfillment of state reclamation policy generally, confer on the Director a 'special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' " (*Ibid.*)

 Pointing out that the Director is not only a co-beneficiary of the financial assurances posted by the mine operator (§ 2773.1, subd. (a)), but has the power to seek forfeiture of those assurances and undertake reclamation of mine sites where the operator is incapable of doing so (*id.,* subds. (b)(4), (d)), the court in *El Dorado* concluded that "the Director's statutorily conferred powers and responsibilities—those expressly granted him under SMARA, as well as those inhering in his capacity as the executive officer of the state department charged with SMARA's implementation—create in him *a substantial interest* in reclamation plans *and financial assurances* being both legally consistent with SMARA and practically adequate to accomplish SMARA's goals and state reclamation policy promulgated thereunder." (*El Dorado*, *supra*, 36 Cal.4th at p. 992, italics added.)

The state Supreme Court's pronouncements in *El Dorado* refute the Associations' claim that the Legislature relegated the Director to *a mere* advisory role in achieving SMARA compliance. Although, as a general principle, the Director has a secondary role when compared to the lead agency's, there is no doubt that the Director has important statutorily rooted responsibilities to ensure that reclamation is completed satisfactorily and that financial assurances are adequate to cover the cost.

If the lead agency unwisely releases financial assurances before the reclamation has been adequately performed, there is a real danger that a mine operator might escape liability and the cost of reclamation will fall on the taxpaying public. Regulation 3805.5(d) minimizes this risk by providing that the Director concur in the lead agency's determination that reclamation has been completed in accordance with the plan such that financial assurances may be released. In this way, the regulation plainly furthers SMARA's "fundamental purpose" of guaranteeing that the public is not left footing the bill for reclaiming lands that are disturbed by surface mining. (*El Dorado*, *supra*, 36 Cal.4th at p. 991.)

In arguing that the Legislature intended the lead agency to be the sole judge of whether mined land has been adequately reclaimed, the Associations also rely on that portion of section 2773.1, subdivision (c), which provides in relevant part: "Financial assurances shall no longer be required of a surface mining operation, and shall be released, *upon written notification by the lead agency*, which shall be forwarded to the operator and the director, that reclamation has been completed in accordance with the approved reclamation plan." (Italics added.) They assert that the lead agency's role as sole decision maker is "inherent" in this language, since notification can only take place after a determination that reclamation has been completed.

■ The word "notify" means "[t]o give notice to" or "inform." (American Heritage Dict. (4th ed. 2000) <http://www.bartleby.com/61/39/N0173900.html> [as of Apr. 12, 2006].) By choosing the word "notification," the Legislature only placed on the lead agency the duty to communicate to the appropriate parties that the determination has been made. Significantly, the Legislature could have provided that the lead agency *make* such a determination but did not do so. (See, e.g., *Chester v. State of California* (1994) 21 Cal.App.4th 1002, 1007 [26 Cal.Rptr.2d 575].) Accordingly, the Legislature's use of the word "notification" is an insufficient basis for concluding that the Legislature intended to confer on the lead agency sole and exclusive power to determine whether reclamation has been satisfactorily completed. (See *Ventura Unified School Dist. v. Superior Court* (2001) 92 Cal.App.4th 811, 815 [112 Cal.Rptr.2d 260] ["The words of the statute may not be altered to accomplish a purpose that does not appear on the face of the statute"].)

■ Furthermore, " 'where the Legislature wants only one agency to have jurisdiction over a matter, it says so unequivocally.' " (*El Dorado, supra,* 36 Cal.4th at p. 992.) The Associations point to no section of SMARA that unequivocally confers upon the lead agency the exclusive authority to determine that reclamation has been completed.

Other provisions of SMARA counter the assertion that the Legislature intended the lead agency to be the lone judge of whether to release a mine operator from his financial obligations. Under section 2773.1, subdivision (a)(4), financial assurances must be made payable to both the lead agency and to the Department, of which the Director is its head. While the lead agency is granted "primary" responsibility to seek forfeiture of financial assurances and to reclaim mine sites, under specified conditions, the Director may intervene and accomplish the same result. (§ 2773.1, subd. (d).) Finally, section 2773.1, subdivision (a)(2) declares that financial assurances "shall remain in effect . . . until reclamation is completed" but leaves unanswered the question of whose job it is to make that determination. Instead, section 2773.1, subdivision (f) directs the Board to "adopt guidelines to *implement this section.*" (Italics added.)[4] Regulation 3805.5(d) fills this gap by providing that the lead agency, with the Director's concurrence, shall decide whether the

---

[4] Subdivision (f) of section 2773.1 also exempted the Board from complying with the normal process of administrative review if it adopted these guidelines "[o]n or before March 1, 1993." Although the Board did not adopt regulation 3805.5 by that date, it has always had the power to enact regulations implementing SMARA pursuant to the grant of authority contained in the original 1975 legislation. (§ 2710 et seq.; 2 Stats. 1975, ch. 1131, § 11, pp. 2793–2803; § 2755.)

reclamation has been completed in conformance with an approved plan. The rule is entirely consistent with the delegation of authority in subdivision (f), as well as the Legislature's delegation to the Board of the overall responsibility to "determine, establish, and maintain an adequate surface mining and reclamation policy." (§ 672.)

At oral argument, the Associations frequently described the concurrence power granted to the Director under regulation 3805.5(d) as a "veto" power, implying that it is unfettered and may be exercised arbitrarily. The truth is just the opposite. Subdivision (d) of regulation 3805.5 works together with, and is the natural consequence of, the other subdivisions of regulation 3805.5, which the Associations do not challenge on this appeal.

Regulation 3805.5 prescribes a step-by-step procedure for release of financial assurances posted by a mine operator. First, the lead agency must provide the Director with an inspection report verifying that the land has been reclaimed in accordance with SMARA. (Regulation 3805.5, subd. (a)(1).) Second, it must also provide a revised financial assurance cost estimate indicating that there are no further outstanding reclamation liabilities. (*Id.*, subd. (a)(2).) Third, the lead agency must provide "[a] statement . . . with supporting documentation" showing that the mined land has been reclaimed in accordance with the approved plan, that there are no outstanding reclamation liabilities, and "*recommending* to *the director* that the financial assurance be released." (*Id.*, subd. (a)(3), italics added.)

From the time he receives the lead agency's documentation, the ball is squarely in the Director's court. He has 45 days in which to review the lead agency's documents, conduct his own inspection and exercise one of three options: (1) notify the agency of his concurrence that there are no outstanding reclamation liabilities and that the financial assurance should be released, at which time it *shall be* released, (2) notify the agency that, based on an inspection, there are aspects of noncompliance with the approved reclamation plan and SMARA, or (3) commence proceedings to compel forfeiture of the financial assurance, as provided by section 2773.1. (Regulation 3805.5, subd. (b)(1), (2) & (3).)

If the Director determines that the mine operator is out of compliance despite the lead agency's determination that the financial assurance should be released, subdivisions (c) and (e) of regulation 3805.5 authorize him to take remedial action by either using his authority under section 2774.1 to ensure that the violations are corrected, or referring the matter to the Board for further action under section 2774.4.

 Thus, contrary to the Associations' view, regulation 3805.5(d) does not grant the Director an unfettered veto power that may be exercised in a vacuum. Rather, it is the last step in an integrated process by which the lead agency makes, and the Director reviews, the final decision to release the mine operator's financial assurance. Reading the regulation reasonably and as a whole, it is clear that the Director may not use his concurrence authority as an excuse to simply sit on his hands and refuse to sign off. He must either approve the release of financial assurance or exercise various enforcement powers already granted to him by SMARA. And he must do so in a timely fashion.

 We conclude there is no inherent conflict between regulation 3805.5(d) and the provisions of SMARA. We reject the Legislative Counsel's opinion concluding otherwise as unpersuasive, especially since it relies primarily on the "advisory" view of the Director's role that has since been discredited by the California Supreme Court in *El Dorado*, *supra*, 36 Cal.4th 971.

### III. Whether the Regulation Exceeded the Scope of the Board's Authority

The Associations also contend that the Board overstepped its jurisdictional bounds in promulgating regulation 3805.5(d) because SMARA only granted it the power to carry out "state policy" for reclamation of mined lands. (§ 2755.) "State policy," they argue, is limited to the subjects mentioned in sections 2756, 2757 and 2758, which cover only "procedures for reclaiming land and for reviewing reclamation plans." Because regulation 3805.5(d) does not address these issues, they reason, it is outside the Board's rulemaking power. This argument reads the Board's authority far too narrowly, and overlooks other important statutes.

 Pursuant to section 672, the Legislature has directed the Board to "*represent the state's interest* in the development, utilization, and conservation of the mineral resources of the state *and the reclamation of mined lands, . . .*" (Italics added.) Section 2755 directs the Board to adopt regulations "establish[ing] state policy for the reclamation of mined lands in accordance with [SMARA]." Under section 2712, objectives of this policy include minimizing adverse environmental effects of mining, the reclamation of lands to usable condition, and the protection of public health and safety. In section 2758, the Legislature has set forth a *noninclusive* list of "objectives and criteria" of this policy, one of which is "[d]etermining the circumstances, if any, under which the approval of a proposed surface mining operation by a lead agency need not be conditioned on a guarantee assuring reclamation of the mined lands." (§ 2758, subd. (c).)

Because the Legislature has granted the Board express authority to determine the circumstances under which *no financial assurances* need be posted to ensure reclamation of mined lands, it logically follows that it also intended the Board to have the *implied* authority to issue regulations that pertain to the circumstances under which financial assurances already in place may be lifted upon the completion of reclamation.

## IV. Conclusion

While "[a]dministrative regulations that alter or amend the statute or enlarge or impair its scope are void," the burden is on the party challenging a regulation to show its invalidity, since "the administrative agency's action comes before the court with a presumption of correctness and regularity." (*Marshall v. McMahon* (1993) 17 Cal.App.4th 1841, 1848 [22 Cal.Rptr.2d 220] (*Marshall*).)

Even the Associations do not deny that the Legislature has not spoken with unequivocal clarity on the question of who shall have final authority to determine that a reclamation plan has been satisfactorily completed and that a mine operator should be released from the obligation of providing financial assurances.

" ' "[T]he absence of any specific [statutory] provisions regarding the regulation of [an issue] does not mean that such a regulation exceeds statutory authority . . . ." [Citations.] The [agency] is authorized to "fill up the details" of the statutory scheme.' " (*Marshall, supra,* 17 Cal.App.4th at p. 1848, quoting *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 362 [185 Cal.Rptr. 453, 650 P.2d 328].)

Given (1) the substantial interest and responsibility of the Director in reclamation enforcement, as exemplified by his status as co-beneficiary of a mine operator's financial assurances, (2) the Board's statutorily prescribed role as the state's representative in enacting regulations designed to achieve satisfactory reclamation of mined lands, and (3) the absence of any clear provision conferring upon the lead agency sole decisionmaking authority with respect to the subject matter, we conclude that the Board acted within the scope of its regulatory authority in requiring a lead agency to obtain the Director's concurrence before notifying the mine operator that he has satisfied the conditions of his reclamation plan and is no longer required to post financial security.

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., concurred.

**NICHOLSON, J.,** Dissenting.—I respectfully dissent.

In my view, the regulation at issue (Cal. Code Regs., tit. 14, § 3805.5, subd. (d)) is inconsistent with the home rule nature of the Surface Mining and Reclamation Act of 1975 (SMARA). (Pub. Resources Code, § 2710 et seq.)

In *People ex rel. Dept. of Conservation v. El Dorado County*, the Supreme Court deemed "accurate[]" this court's description of SMARA, which stated: " 'In keeping with the recognition of the diverse conditions throughout the state, SMARA provides for "home rule," with the local lead agency having primary responsibility.' " (*People ex rel. Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971, 984 [32 Cal.Rptr.3d 109, 116 P.3d 567] (*El Dorado*).) Although the State Mining and Geology Board sets policy and reviews the ordinances of the lead agency, the Director has a limited role, secondary to the lead agency, as to projects undertaken within the lead agency's purview. "[T]he director is vested with significant, but limited, powers and responsibilities under SMARA . . . ." (*Id.* at p. 986.)

Before approving a reclamation plan and financial assurances, the lead agency submits the proposal to the Director, who may comment. But the comments do not bind the lead agency. (*El Dorado, supra,* 36 Cal.4th at pp. 984–985, citing SMARA.) Once a project is undertaken, the Director may initiate enforcement actions, but only if the lead agency fails to act. (36 Cal.4th at p. 985, citing SMARA.) " 'Where the lead agency fails to fulfill its duties under SMARA, the Board may take over the powers of a lead agency . . . .' " (36 Cal.4th at p. 985, citing SMARA.) Note in this regard that the Board, not the Director, takes over for the lead agency. This discussion does not list all of the Director's responsibilities under SMARA, but it is indicative of the nature of those responsibilities.

Although, as the Supreme Court concluded in *El Dorado*, the Director's role is not merely advisory, it is nonetheless secondary and limited. Unless the lead agency fails to fulfill its responsibilities, the Director has no authority to countermand the decisions of the lead agency. The home rule nature of the statutory scheme is interrupted only when home rule breaks down. The regulation at issue, however, gives the Director primary, though joint, authority on the single decision of whether to release financial assurances and therefore prevents the lead agency from acting in its SMARA role.

The Legislature, in adopting an act such as SMARA, declares public policy and fixes the standard. In filling up the details, the administrative agency cannot deviate from the Legislature's standard but instead must harmonize with the act. (*Knudsen Creamery Co. v. Brock* (1951) 37 Cal.2d 485, 492–493 [234 P.2d 26].) To be valid, a regulation must be (1) consistent with and not in conflict with the act and (2) reasonably necessary to effectuate the act's purpose. (Gov. Code, § 11342.2; *Physicians & Surgeons Laboratories, Inc. v. Department of Health Services* (1992) 6 Cal.App.4th 968, 982 [8 Cal.Rptr.2d 565].) Although SMARA does not explicitly state that the lead agency, alone, decides whether to release financial assurances, any other interpretation violates the Legislature's intent to establish home rule and allow the lead agency primary responsibility within its jurisdiction.

This analysis is similar to the analysis of the Legislative Counsel's office. Yet the majority gives the Legislative Counsel analysis short shrift, merely noting that the analysis was done before the Supreme Court decided *El Dorado*, in which the court held the Director's role was not merely advisory. In my opinion, the Legislative Counsel analysis was much broader and appropriately relied on the home rule nature of SMARA. The *El Dorado* court also noted the home rule nature of SMARA. However, *El Dorado* was not about home rule; it was about whether the Director has standing to petition for judicial relief when the Director believes home rule has failed. This case presents the very different question of who has primary responsibility.

Whether there may be public policy reasons to abrogate home rule is irrelevant in the face of the Legislature's determination to give lead agencies the lead. Therefore, remonstrances such as the protection of the public fisc from instances in which financial assurances are released cannot justify giving the Director primary authority over the decision to release. In any event, it would seem that a lead agency, usually an elected council, would be more politically attuned to the public's financial loss than would be an appointed, distant bureaucrat.

I also do not find it persuasive on the issue before us that the Director is a co-beneficiary on the financial assurances or that, as the *El Dorado* court held, the Director has "a substantial interest in reclamation plans and financial assurances being both legally consistent with SMARA and practically adequate to accomplish SMARA's goals and state reclamation policy promulgated thereunder." (*El Dorado, supra,* 36 Cal.4th at p. 992, fn. omitted.) If this gives the Director primary responsibility for determining whether to release financial assurances under SMARA, then why did the Legislature give the lead agency primary responsibility for reviewing and approving the reclamation plan and financial assurances in the first place? The Board can set policy

regarding the release of financial assurances by adopting regulations to guide the lead agency. That would be consistent with the home rule nature of SMARA. Allowing the Director to prevent the lead agency from making the release determination, in the first instance, however, is not similarly consistent. I would, therefore, reverse the judgment of the trial court and grant declaratory relief.