Filed 9/12/24  (review denied 1/15/25; reposted with Supreme Court order and statement)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DEARI COLE,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>        Real Party in Interest. | A169804<br><br>(Contra Costa County Super. Ct. No. P2400263) |

Deari Cole was committed to a developmental center under Welfare and Institutions Code section 6500, which governs commitments of those with developmental disabilities who are a danger to themselves or others.[1]  A petition to extend the commitment was filed close to the end of the commitment period, too late for trial to take place before it expired, and Cole was held pending trial.  Cole brought this petition for writ of mandate or habeas corpus, contending principles of equal protection demanded his release pending trial.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

1

Cole has since been released from custody for unrelated reasons, and the matter is now moot.  Nevertheless, because the issues he raises are of public importance and are capable of recurring yet escaping review, we exercise our discretion to consider them.  Having done so, we reject his arguments on the merits before dismissing the petition as moot.  (See *People v. G.A.* (2023) 93 Cal.App.5th 1126, 1128; *People v. Sweeney* (2009) 175 Cal.App.4th 210, 214.)

## FACTUAL AND PROCEDURAL BACKGROUND

Cole was charged with felony possession of a firearm and ammunition, second degree burglary, and two counts of petty theft, and in July 2022 he was found incompetent to stand trial and referred to the Regional Center of the East Bay.  On September 30, 2022, the People filed a petition to initiate a commit under section 6500, alleging Cole had a developmental disability (more specifically, a diagnosed intellectual disability) and that he was a danger to himself or others.  The trial court found Cole had a developmental disability, that as a result he could not understand the nature and purpose of the proceedings against him and assist counsel, and that he was a danger to himself or others as defined in section 6500, subdivision (a)(1).  The court ordered a conservatorship for one year, through February 1, 2024.  On the Regional Center's recommendation, the court ordered Cole placed in the Porterville Developmental Center.

On January 30, 2024, two days before the commitment was set to expire, the People filed a petition to extend it.  On the same date the trial court ordered Cole held pending the trial on the recommitment petition.

Cole filed a petition for writ of mandate and/or habeas corpus on February 23, 2024, alleging that principles of equal protection required his release pending trial.

2

We summarily denied the petition on March 6, 2024.  Cole petitioned for review, and on April 24 our high court granted the petition and transferred the matter to us with directions to vacate our order denying the writ petition and to issue an order to show cause—which we have done.

**DISCUSSION**

Cole argues that because the extended commitment petition was filed too late for trial on the petition to be held before expiration of his current commitment under section 6500, equal protection demanded his release from custody, a right granted to those committed under two other civil commitment statutes.

### *Statutory Background*

California has multiple procedures for involuntary commitment of those with various mental problems who pose a threat to their own welfare or the safety of others.  (*People v. Barrett* (2012) 54 Cal.4th 1081, 1093 (*Barrett*).)  At issue here are three of these statutory schemes.  The first is the one under which Cole was confined, section 6500, which authorizes civil commitment of "[a] person with a developmental disability . . . if the person is found to be a danger to self or others."  (§ 6500, subd. (b)(1).)  Developmental disability, in this context, means a "disability that originates before an individual attains 18 years of age, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual"; this definition expressly encompasses an intellectual disability.  (§§ 4512, subd. (a)(1), 6500, subd. (a)(2).)  A person who falls within the statutory scheme may be committed for "suitable treatment and habilitation services," meaning "the least restrictive residential placement necessary to achieve the purposes of treatment."  (§ 6509, subd. (a).)  A commitment order under section 6500 expires a year after it is made.  (§ 6500, subd. (b)(1)(A).)

3

Subsequent petitions may be brought for additional periods of commitment, in which case "the procedures followed shall be the same as with the initial petition for commitment." (§ 6500, subd. (b)(1)(B).)

Among those procedures, the hearing on a subsequent petition must be set "no more than 60 days after the filing of the petition," and it may be continued only on a showing of good cause. (§ 6503.) Pending the hearing, the court may order the person placed in a suitable placement, including a state developmental center. (§ 6506.) Thus, this statutory scheme does not require a recommitment petition to be filed in time for the hearing to take place during the initial commitment period, and it authorizes the court to retain the person in a placement pending the hearing even after the commitment expires.

Different procedures are available under two other statutory schemes to which Cole directs our attention. One of them, for offenders found not guilty by reason of insanity (NGI), authorizes a commitment to extend past the person's maximum term of confinement by increments of two years, and requires trial on a petition for extended commitment to begin "no later than 30 calendar days prior to the time the person would otherwise have been released, unless that time is waived by the person or unless good cause is shown." (Pen. Code, § 1026.5, subd. (b)(4), see also subds. (b)(1), (b)(8).)

The remaining statutory scheme is for offenders with a mental health disorder (OMHD),[2] a category that encompasses those with a "severe mental

---

[2] Such offenders were formerly known as mentally disordered offenders (MDO's). We will adopt the current usage even when discussing cases that used the term MDO. (See Pen. Code, § 2962, subd. (d)(3); *Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1095, fn. 3 (*Eric B.*).) Similarly, except when quoting a case that uses the term "mentally retarded," we instead use the terms "developmental disability" or "intellectual disability" currently found in

4

health disorder that is not in remission or that cannot be kept in remission without treatment," and which is defined to exclude "intellectual disability or other developmental disabilities." (Pen. Code, § 2962, subds. (a)(1), (a)(2).) Such offenders may be committed to the State Department of State Hospitals for a period of one year for necessary treatment. (§§ 2962, 2970, subd. (b).) A petition for a recommitment may be brought before termination of the commitment, and trial on the petition must begin at least 30 calendar days before the person would have been released, unless there is a waiver or a showing of good cause. (Pen. Code, § 2972, subds. (a)(2), (e).)

Central to the case before us, in the case of both NGI's and OMHD's, if an extension petition is filed before the expiration of the commitment but, without good cause, too late to allow a reasonable time to prepare for trial before the commitment period ends, the defendant must be released pending the trial. (*People v. Lara* (2010) 48 Cal.4th 216, 229–236 (*Lara*); *People v. Cobb* (2010) 48 Cal.4th 243, 252 (*Cobb*).)[3] That procedure stands in contrast to a petition to extend a section 6500 commitment, which must be *filed* before expiration of the commitment period but need not be *heard* for up to 60 days thereafter, during which time the person may be required to remain in custodial placement. (§§ 6503, 6506; *Cramer v. Gillermina R.* (1981) 125 Cal.App.3d 380, 393 [those in § 6500 commitment "shall be reviewed no more than fourteen months after their last judicial review"].)

---

the pertinent statutes. (See Stats. 2012, ch. 25, § 19 [amending § 6500], Stats. 2013, ch. 289, § 3 [amending § 4512].)

[3] A defendant entitled to release under this rule may nevertheless be subject to civil confinement in a therapeutic setting under the Lanterman-Petris-Short Act (§ 5000 et seq; LPS Act). (*Lara, supra,* 48 Cal.4th at p. 236, *Cobb, supra,* 48 Cal.4th at p. 252, fn. 3.)

### *Principles of Equal Protection*

Both the federal and the California Constitutions guarantee equal protection of the laws. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) This guarantee is intended to " 'ensure[] that the government does not treat a group of people unequally without some justification.' " (*People v. Hardin* (2024) 15 Cal.5th 834, 847 (*Hardin*).)

Traditionally, California cases have engaged in a two-part inquiry to determine if there has been a violation of the guarantee of equal protection. First, the courts asked whether a classification affected two or more groups that were similarly situated in an unequal manner. (*People v. Chatman* (2018) 4 Cal.5th 277, 289.) If the groups were "similarly situated in all material respects," the court would then consider whether the challenged classification was justified under the appropriate standard of review. (*Id*. at p. 289.) In the first step, the inquiry was "not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)

Recently, in *Hardin*, our high court modified this rule to eliminate the first step of the analysis "when plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection," that is, when the classification appears on the face of the law. (*Hardin*, *supra*, 15 Cal.5th at p. 850.) In such a case, the court held, "courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question. The only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review." (*Id*. at pp. 850–851.) But, the court went on to explain, it did not

6

call into question any earlier decisions "that purported to dispose of an equal protection challenge upon deciding that the challenged disparate treatment did not involve groups that were similarly situated for the purposes of the law in question"; in fact, "the conclusion in each of those cases could just as well have been cast as a conclusion about whether the difference in treatment was adequately justified under the applicable standard of review." (*Id*. at p. 851, citing *People v. Salazar* (2016) 63 Cal.4th 214, 227 [defendants who commit capital crime after earlier conviction of juvenile murder in superior court not similarly situated to those whose earlier murder was adjudicated in juvenile court, because Legislature could conclude their culpability was different]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1242–1243 [capital defendants not similarly situated to those with ordinary sentencing enhancements because of aggravating circumstance of capital offense].)

The classifications at issue here appear on the face of the laws in question, and we will apply the analysis set out in *Hardin*. As the party challenging the law, Cole bears the burden to show the different treatment for different groups is not justified. (See *Hardin, supra*, 15 Cal.5th at p. 851.) Where, as here, the facts are undisputed, we review independently whether the classifications offend equal protection. (*People v. Nolasco* (2021) 67 Cal.App.5th 209, 217 (*Nolasco*).)

*Analysis*

Cole's central argument is that he was deprived of equal protection because, as one committed under section 6500, he was held in custody after his commitment expired while awaiting trial on the extended commitment petition, whereas an OMHD or NGI committee would not have been. The first question we face is the level of scrutiny appropriate to analyzing this claim. Cole urges us to apply strict scrutiny because the fundamental right

7

to liberty is at stake. The Attorney General advocates for the more deferential rational basis standard.

The Attorney General relies primarily on two cases, our high court's decision in *Barrett* and a Court of Appeal decision in *Nolasco*, a case that follows *Barrett*. Because *Nolasco* more closely tracks the issues before us, we begin there. The question in *Nolasco* was whether civil commitment schemes that peg the end of a recommitment period to different events offend equal protection. In the case of a so-called Murphy conservatorship under the LPS Act,[4] a recommitment order must terminate by the first anniversary of the *initial* commitment order (§ 5361, subd. (b)), but in a section 6500 commitment, it runs through the anniversary of the *recommitment* order (§ 6500, subd. (b)(1)). This difference results in a longer recommitment period for persons committed under section 6500 when, as is common, a recommitment order is not made until after the initial commitment has expired. (*Nolasco, supra,* 67 Cal.App.5th at p. 215.) The *Nolasco* court set forth the then-governing two-step process for evaluating such a claim, then considered the level of scrutiny appropriate to determine the constitutional sufficiency of the government's justification for the differential treatment. (*Id.* at pp. 220–221.)

The *Nolasco* court noted that the law on this point was "in a state of flux." (*Nolasco, supra,* 67 Cal.App.5th at p. 224.) California courts had traditionally applied strict scrutiny to claims of disparate treatment in connection with civil commitment. (See, e.g., *In re Moye* (1978) 22 Cal.3d

---

[4] A Murphy conservatorship is used in certain circumstances where a person has been ruled incompetent to stand trial and " 'represents a substantial danger of physical harm to others by reason of a mental disease, defect, or disorder.' " (*Eric B., supra,* 12 Cal.5th at p. 1096; § 5008, subd. (h)(1)(B).)

457, 465, superseded by statute on other grounds as stated in *People v. Superior Court* (*Frezier*) (2020) 54 Cal.App.5th 652, 662–663 [Attorney General concedes strict scrutiny applies in challenge to indefinite confinement of NGI's]; *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 171, fn. 8 [LPS conservatorship implicates a fundamental liberty interest].) But more recently the California Supreme Court applied two other approaches in analogous cases without expressly overruling the earlier authorities. (*Nolasco*, at pp. 224–225.) Specifically, when considering a challenge by a sexually violent predator (SVP) to his indefinite commitment in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee*), superseded by statute on another ground as stated in *People v. McCloud* (2021) 63 Cal.App.5th 1, 15, the high court appeared to apply a standard that was "less rigorous than strict scrutiny but more onerous than rational basis scrutiny." (*Nolasco*, at pp. 224–225.) The Court applied not "the 'usual judicial deference to legislative findings' consonant with rational basis scrutiny," but rather " 'independent judgment of the facts to ascertain whether the legislative body " 'has drawn reasonable inferences based on substantial evidence.' " ' " (*Nolasco*, at p. 225, quoting *McKee*, at p. 1206; see *McKee*, at pp. 1184–1185.) And more recently, the *Nolasco* court went on, in *Barrett* the high court applied rational basis review in deciding whether equal protection required a personal waiver of the right to jury trial by a person subject to commitment proceedings under section 6500, as was required of those subject to LPS proceedings. (*Nolasco*, at p. 225, citing *Barrett*, *supra*, 54 Cal.4th at p. 1111, fn. 21; see *Barrett*, at pp. 1106–1107.)

These varying standards, according to the *Nolasco* court, had created confusion in the courts of appeal and led to inconsistent results. (*Nolasco*, *supra*, 67 Cal.App.5th at p. 225.) The *Nolasco* court explained that it chose

9

"to follow *Barrett*—and hence to apply rational basis scrutiny—because *Barrett* is the most recent pronouncement by our Supreme Court as to the pertinent level of scrutiny to apply when comparing divergent civil commitment procedures" and because it was the authority most on-point. (*Nolasco*, at p. 225.)[5]

Bearing in mind these authorities, we are not persuaded that strict scrutiny applies here. Strict scrutiny is proper when a disparity in treatment implicates a suspect class or a fundamental right. (*Flint, supra,* 22 Cal.App.5th at p. 990.) Otherwise, the challenger must show that the challenged law "is not rationally related to any legitimate government purpose." (*Ibid.*) The developmentally disabled are not a suspect class for these purposes. (*Marshall v. McMahon* (1993) 17 Cal.App.4th 1841, 1851, citing *Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 445–446, and *Adoption of Kay C.* (1991) 228 Cal.App.3d 741, 753–754; *Barrett, supra,* 54 Cal.4th at p. 1111, fn. 21 ["we have correctly applied the United States Supreme Court's prevailing 'rational basis' standard for analyzing the equal protection claims of mentally retarded persons"].) Nor are we persuaded that

---

[5] In *Eric B.*, our Supreme Court noted that appellate courts have reached different conclusions on the appropriate level of scrutiny for evaluating claims of disparate treatment in civil commitments, but it left resolution of the issue for another day. (*Eric B., supra,* 12 Cal.5th at pp. 1107–1108, citing *Nolasco, supra,* 67 Cal.App.5th at p. 225 and *People. v. Flint* (2018) 22 Cal.App.5th 983, 992–993 (*Flint*).) That day may be approaching. In *People v. Cannon* (2022) 85 Cal.App.5th 786, 798–799, our colleagues in Division Five followed *Nolasco* and *People v. Magana* (2022) 76 Cal.App.5th 310, 324, in concluding rational basis review applied in determining whether the Sexually Violent Predators Act (§§ 6600 et seq.) violates equal protection by not requiring a personal waiver of a jury trial right, as other civil commitment statutes require. The California Supreme Court has granted review in *Cannon*. (*People v. Cannon*, review granted Feb. 15, 2023, S277995.)

the current challenge implicates a fundamental right in a manner that triggers the use of strict scrutiny. The question is not whether a person should be civilly committed—that is, deprived of liberty—but the outer limits of the duration of that confinement—that is, whether it may continue for an additional 60 days after the commitment expires, pending hearing on a petition to extend the commitment.

The court in *People v. Barner* (2024) 100 Cal.App.5th 642 (*Barner*) made this point in a different context. The appellant had been found not guilty of a crime by reason of insanity and was committed to the State Department of State Hospitals for an indeterminate life term. (*Id.* at p. 645.) He contended this commitment deprived him of his right to equal protection because, unlike an insanity acquittee with a determinate term of commitment, he must remain in physical custody until his sanity was restored even if he did not represent a substantial danger to others. (*Id.* at p. 662.) He contended the court should apply strict scrutiny because the length of the term of commitment affected his personal liberty, a fundamental interest. (*Id.* at p. 664.) The appellate court instead applied rational basis review, analogizing to case law holding that a defendant has no fundamental interest in a specific term of imprisonment and explaining that "where the issue is not whether a deprivation of an individual's liberty will occur, but rather the duration of that deprivation, rational basis review is appropriate because ' " ' "the power to define crimes and fix penalties is vested exclusively in the legislative branch," ' " ' " and "the issue here is the duration of the commitment period, not whether insanity acquittees will be deprived of their liberty." (*Ibid.*; see *People v. Wilkinson* (2004) 33 Cal.4th 821, 840–841; *People v. K.P.* (2018) 30 Cal.App.5th 331, 343 ["where the issue

11

is not whether a deprivation of an individual's liberty will occur, but rather the duration of that deprivation, rational basis review is appropriate"].)

This conclusion is consistent with our high court's explanation in *McKee* that "different classes of individuals civilly committed need not be treated identically. . . . [Although] fundamental distinctions between classes of individuals subject to civil commitment are subject to strict scrutiny[,] . . . the government[ has a] legitimate capacity to make *reasonable distinctions*[,] . . . '[*including v*]*ariation of the length and conditions of confinement*, depending on degrees of danger reasonably perceived as to special classes of persons.' " (*McKee*, *supra*, 47 Cal.4th at p. 1210, italics added.) The question is whether the "distinctions in classes of persons subject to civil commitment are reasonable and factually based." (*Ibid*.) The high court summarized, "[w]hen a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body ' "has drawn reasonable inferences based on substantial evidence." ' " (*Id*. at p. 1206.) The Court emphasized it was *not* holding that " 'every detail of every civil commitment program is subject to strict scrutiny.' " (*Id*. at p. 1210, fn. 13.)

So too here. The issue in this case is not whether Cole would be deprived of his liberty; that determination was made when he was committed under section 6500. The issue is the disparity in whether the confinement may continue for a limited period while awaiting a hearing on a petition to extend his commitment. This, in our view, is not a "fundamental distinction[]" between classes of individuals subject to civil commitment" but rather a reasonable variation in the length of the confinement, a matter not subject to strict scrutiny. (*McKee*, *supra*, 47 Cal.4th at p. 1210; see *Barner*, *supra*, 100

Cal.App.5th at p. 664; *People v. K.P.*, *supra*, 30 Cal.App.5th at p. 343.)

Indeed, even the two statutory schemes to which Cole compares his own vary in the length of a commitment permitted before a court must consider whether it should be renewed: two years in the case of NGI's (Pen. Code, § 1026.5, subd. (b)(8)), and one year in the case of OMHD's (Pen. Code, § 2970, subd. (b)). The fourteen months effectively allowed for a person committed under section 6500 falls comfortably within this range. In the circumstances of this case, we conclude some form of rational basis review is appropriate.

We recognize that when our high court compared the term of confinement for SVP's against that for other ex-felons subject to civil commitment in *McKee*, it suggested a more searching type of inquiry than is customary for rational basis review because liberty from involuntary confinement is at stake. (*McKee*, *supra*, 47 Cal.4th at p. 1184.) In such a case, according to the *McKee* court, "the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body ' "has drawn reasonable inferences based on substantial evidence." ' " (*Id.* at p. 1206.) Justice Liu has similarly advocated for a robust application of rational basis review for statutory classifications based on developmental disability. (See *Barrett*, *supra*, 54 Cal.4th at pp. 1137–1145 (conc. & dis. opn. of Liu, J.) [criticizing "conventional rational basis review" in challenge comparing right to jury trial advisement in civil commitment schemes, and endorsing stricter approach that requires record support for government's proffered rationale for differential treatment].)

We conclude there is no equal protection violation under either conventional rational basis review *or* this more searching permutation. We

start from the premise that "different classes of individuals civilly committed need not be treated identically." (*McKee*, *supra*, 47 Cal.4th at p. 1210.) And in *Barrett*, our high court explained why differences between dangerous developmentally disabled persons committed under section 6500 and dangerous mentally disordered persons committed under the LPS Act justify the differential requirements for waiver of the right to a jury trial. Under the two-step test then used, the Court explained that, even assuming the two groups were similarly situated as to the existence of a basic jury trial right, "nothing compels the conclusion that they are also similarly situated as to the ancillary purpose that an express jury trial advisement, and an express personal waiver, purportedly serve." (*Barrett*, *supra*, 54 Cal.4th at p. 1108.)

The Court reached this conclusion because of differences between the individuals covered by the respective statutory schemes. The LPS Act provides for detention and treatment of certain people with "mental disorders," a term construed in the case law to mean "conditions that may arise suddenly and, for the first time, in adulthood," that may be "intermittent or short lived" and require only temporary treatment, and that do not necessarily deprive the person of the ability to function in a competent manner. (*Barrett*, *supra*, 54 Cal.4th at pp. 1108–1109.) By contrast, for those alleged to fall within the scope of section 6500, "the commitment process itself raises substantial doubts about their cognitive and intellectual functioning sufficient to limit the personal and procedural role they play" in proceedings. (*Id*. at p. 1109.)

A similar distinction informs our analysis as well. For purposes of section 6500, a developmental disability is a substantial disability that originates in childhood and continues indefinitely. (§ 4512, subd. (a)(1); see § 6500, subd. (a)(2).) The other two statutes at issue govern extended

14

commitment of NGI's, who pose a substantial danger of harm to others "by reason of a mental disease, defect, or disorder" (Pen. Code, § 1026.5, subd. (b)(1)), and OMHD's, who have "a severe mental health disorder that is not in remission or that cannot be kept in remission without treatment" (Pen. Code, § 2962, subd. (a)(1); see *People v. Allen* (2007) 42 Cal.4th 91, 99).

Our Supreme Court has held that, without a time waiver or good cause, the OHMD statutory scheme does not allow continued confinement when trial on an extension petition does not begin before the scheduled release date. (*Cobb*, *supra*, 48 Cal.4th at p. 252.) In so doing, it emphasized that the criteria for continued commitment "relate, not to the past, but to the defendant's current condition": that is, the questions are whether the defendant has a severe mental disorder that is not in remission and whether the defendant continues to pose a substantial danger to others. (*Ibid*.) This emphasis on a defendant's current condition is consistent with the high court's explanation in *Barrett* that mental illness and related disorders may be intermittent or short-lived. (*Barrett*, *supra*, 54 Cal.4th at p. 1108.)

The Legislature could reasonably provide different procedures for those with a developmental disability under section 6500, which by definition can be expected to continue indefinitely. (§ 4512, subd. (a)(1); see § 6500, subd. (a)(2).) As the court in *Nolasco* explained, "[b]ecause a person's *mental illness* can come and go, there is a greater danger that delay in evaluating his condition—and delay in his release arising from the time it takes to litigate recommitment—could result in the unnecessary commitment of a person who no longer suffers from a mental illness that poses a danger," but that in contrast, "[c]hances are scant that a person will 'recover' from a *developmental disability* and hence there is less danger of their unnecessarily

15

prolonged commitment." (*Nolasco*, *supra*, 67 Cal.App.5th at p. 223, italics added.)

We bear in mind that section 6500 does not allow for an open-ended delay in the recommitment hearing, but rather provides for continued confinement during a 60-day window within which the hearing must be held, absent a showing of good cause. (§§ 6500, subd. (b)(1)(B), 6503, 6506.) Cole complains that the result is "a system of de facto 14-month commitments." But in light of the differences between those with developmental disabilities and mental illness, we are not persuaded the Legislature lacked a rational basis for allowing continued confinement during a 14-month period before renewal of a section 6500 commitment, instead of the 12-month period for OMHD's (Pen. Code, § 2970, subd. (b)) or the *two-year* period for NGI's (Pen. Code, § 1026.5, subd. (b)(8)).

In reaching this conclusion, we do not discount the seriousness of depriving those with developmental disabilities of their freedom or the risk of abuses, particularly in light of unacceptable practices that have taken place in the past in this state and elsewhere. (See *Barrett*, *supra*, 54 Cal.4th at pp. 1120–1125 (conc. & dis. opn. of Liu, J.).) We also recognize the possibility that, although a person does not " 'recover; " from a developmental disability (*Nolasco*, *supra*, 67 Cal.App.5th at p. 223), that person might become less dangerous to self or others (perhaps as a result of treatment), and thus no longer fall within the scope of section 6500. (See § 6500, subd. (b)(1).) Nevertheless, in light of the lower level of risk of an unnecessarily prolonged commitment under section 6500, the directive that a commitment be to the least restrictive placement that will achieve the purposes of treatment, the limited time between expiration of the commitment and the hearing on a recommitment petition (in the absence of a showing of good cause), and the

fact that the permissible length of confinement under section 6500—even accounting for the possibility of 60 additional days–is well within the range of the statutory schemes to which Cole compares it, we find no violation of equal protection in the disparate treatment he challenges.

## DISPOSITION

Having concluded Cole was not deprived of his constitutional right to equal protection, we dismiss the petition for writ of mandate or habeas corpus as moot.

TUCHER, P. J.

WE CONCUR:

PETROU, J.
RODRÍGUEZ, J.

*Cole v. Superior Court* (A169804)

17

Trial Court:        Contra Costa County Superior Court

Trial Judge:        Hon. Julia Campins

Counsel:            Ellen McDonnell, Public Defender, Jeremy Price, Taina
                    Gomez-Ferretti, and Christy Wills Pierce, Deputy Public
                    Defenders, for Petitioner

                    Diana Becton, District Attorney, Angela Dib, Anthony
                    Augustyn, Brianna Goodfellow, Deputy District
                    Attorneys for Real Party in Interest

**S287432**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

DEARI COLE, Petitioner,

v.

SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent;

THE PEOPLE, Real Party in Interest.

_____

The petition for review is denied.


(See Concurring Statement by Liu, J., joined by Evans, J.)


_____/s/_____
*Chief Justice*

COLE v. SUPERIOR COURT
S287432

Concurring Statement by Justice Liu

Petitioner Deari Cole was civilly committed to Porterville Developmental Center in 2023 under Welfare and Institutions Code section 6500 after the superior court found that he had a developmental disability, that he could not understand the proceedings against him due to his disability, and that he was a danger to himself and others. (All undesignated statutory references are to this code.) Cole's commitment order automatically expired on February 1, 2024. (§ 6500, subd. (b)(1)(A) [commitment order for persons with a developmental disability "shall expire automatically" after "one year"].) On January 30, 2024, two days before the order's expiration date, the District Attorney filed a petition to recommit Cole for another 12 months. Cole's counsel objected to the timing of the District Attorney's filing and requested that Cole be released pending trial on the recommitment petition. The court denied his request. Relying primarily on section 6506, which authorizes interim placement at a suitable facility, the court ordered Cole to be detained at Porterville pending trial set for February 27, 2024. Cole was eventually released on April 30, 2024, 15 months after his original commitment order.

Cole alleges that under state and federal equal protection principles, an individual whose section 6500 commitment has automatically expired must be released pending trial when,

1

without good cause, a recommitment petition is filed too late for a fair trial to occur during the commitment period, unless the commitment provisions of the Lanterman-Petris-Short (LPS) Act apply. He reasons that had he been subject to the statutory schemes for offenders found not guilty by reason of insanity (NGI) or those with a mental health disorder (OMHD) (Pen. Code, §§ 1026.5, subd. (b), 2972), a late filing without good cause would have entitled him to release pending trial on the recommitment petition. (*People v. Lara* (2010) 48 Cal.4th 216, 236 [NGI]); *People v. Cobb* (2010) 48 Cal.4th 244, 252 [OMHD].)

Unlike the statutory schemes for NGI or OMHD civil commitments, section 6500 is silent on the timing of filing a recommitment petition. (Cf. Pen. Code, §§ 1026.5, subd. (b)(2), (4) [NGI recommitment petition must generally be filed no less than 90 days before expiration of original commitment, and trial must generally begin 30 days before termination of commitment], 2972, subd. (a)(2) [trial on an OMHD recommitment petition must generally begin 30 days before termination of commitment].) A person with a developmental disability who is found to be a danger to self or others is subject to a one-year commitment that "expires automatically." (§ 6500, subd. (b)(1)(A).) A hearing on a recommitment petition must occur within 60 days of the filing of the petition (§§ 6503, 6500, subd. (b)(1)(B)), and such a person may be placed in a suitable facility pending the hearing (§ 6506).

Despite the lack of a deadline for filing a recommitment petition, it seems clear that the Legislature intended for persons committed under section 6500 to be subject to a one-year commitment. The statute unambiguously says "[a]n order of commitment . . . shall expire automatically one year after the order of commitment is made." (§ 6500, subd. (b)(1)(A).) Cole's

original commitment was extended beyond one year because the prosecution did not file for recommitment until two days before his release. No good cause for this last-minute filing appears in the record. It seems questionable whether the Legislature intended to authorize confinement of section 6500 committees for 60 days or more beyond the one-year limit simply based on a district attorney's decision to petition for recommitment close to the expiration date, with no showing of good cause required. In light of the plain language of section 6500, subdivision (b)(1)(A), there is a good argument that any confinement while awaiting trial on a recommitment petition (§ 6506) must occur within, not beyond, the one-year commitment period. This argument is not diminished by the fact that an individual's developmental disability may "be expected to continue indefinitely." (*Cole v. Superior Court* (2024) 104 Cal.App.5th 1280, 1295.) In many cases, persons with developmental disabilities can be responsive to treatment, habilitation, and care such that they no longer pose a danger to themselves or others. (*People v. G.A.* (2023) 93 Cal.App.5th 1126, 1132 [for section 6500 commitments, " 'due process demands proof of *current dangerousness* ' "].)

Further percolation may prompt us to take up this issue in a future case. In the meantime, the Legislature may wish to clarify whether section 6500 committees may be confined beyond one year in the manner that Cole was here. (Cf. *People v. Barrett* (2012) 54 Cal.4th 1081, 1120 (conc. & dis. opn. of Liu, J.) ["Civil proceedings against individuals alleged to be [developmentally disabled] and dangerous . . . have a regrettably long history of abuse."].)

**LIU, J.**

**I Concur:**
**EVANS, J.**